## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**TOMMY MEADOWS,**

      **Plaintiff,**

      **v.**

**CORRECTIONAL OFFICER C.
COPPICK,** *et al.***,**

      **Defendants.**

**Case No. 1:21-cv-322**
**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Litkovitz**

## OPINION AND ORDER

This cause comes before the Court on the Magistrate Judge's August 3, 2022, Report and Recommendation ("R&R," Doc. 30) directed at Defendants' Motion for Judgment on the Pleadings (Doc. 22), in which Defendants sought dismissal of the entire action. The R&R recommends the Court grant Defendants' Motion, but only as to four claims. In particular, the R&R advises the Court to dismiss Plaintiff Tommy Meadows' (1) excessive use of force claim against Defendant D. Smith, (2) failure to intervene claim against Defendant William Bauer, (3) supervisory liability claim against Bauer, and (4) retaliation claim against Defendant K. Plowman. (Doc. 30, #201). But the R&R recommends the Court deny Defendants' Motion in all other respects. (*Id.*). Meadows filed Objections (Doc. 33) to the proposed dismissal of the two claims against Bauer and the one against Plowman (but did not object to the proposed dismissal of the excessive-force claim against D. Smith). Defendants did not object to the R&R.

For the reasons set forth below, the Court **SUSTAINS** Meadows' Objections (Doc. 33) to the R&R (Doc. 30). Accordingly, the Court **ADOPTS IN PART** the R&R (Doc. 30). As a result, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings (Doc. 22) as to all claims except the excessive use of force claim against D. Smith, but **GRANTS** Defendants' Motion (Doc. 22) to the extent it seeks judgment on the pleadings as to that latter claim. Meadows may proceed on all other claims as alleged in his Second Amended Complaint (Doc. 17).

## BACKGROUND

Plaintiff Tommy Meadows is an inmate at the Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio. ("2d Am. Compl.," Doc. 17, #77). He is serving a lengthy sentence for murder, aggravated arson, and assault. *Tommy Meadows Offender Details*, OHIO DEP'T OF REHAB. & CORR. (last visited Oct. 18, 2022), https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A438207. With the assistance of counsel, he initiated this § 1983 action on May 13, 2021, claiming prison staff violated his constitutional rights. (Compl., Doc 1).

In his Second Amended Complaint, the now-operative complaint, Meadows alleges correctional officers violated his rights in connection with a fight that occurred at SOCF on May 19, 2019. (2d Am. Compl., Doc. 17, #77–78). According to Meadows, he and other inmates were in line for meal time when a fight erupted. (*Id.*). Meadows claims he stood "several feet away from the altercation" and took no part in it. (*Id.*). However, Meadows says Defendant Officer C. Coppick handcuffed Meadows anyway and removed him while "twist[ing] and bend[ing Meadows'] fingers and hand." (*Id.*).

Once away from the altercation, Meadows alleges Coppick pushed him against a wall, and then threw him down, causing Meadows' head to strike the ground. (*Id.*). Defendant Officer D. Smith then approached and shackled his legs. (*Id.*). Next, Meadows claims Coppick pulled him up from the ground, and then Coppick and Defendant Officer K. Plowman led Meadows toward the "strip cell." (*Id.*). Along the way, they again pushed him into the wall, causing Meadows' face to strike it, and "leav[e] a large smear of blood." (*Id.*). The Defendants then took Meadows back to the ground, where Coppick, Plowman, and Boyd pinned him down, and Defendant Kinner pressed his knee into Meadows' head. (*Id.*). As a result, Meadows' head "was forcefully shoved into the ground multiple times," causing two lacerations and profuse bleeding. (*Id.*). Following this, Coppick and Kinner lifted Meadows up once more and continued him on to the "J2 strip cage." (*Id.* at #78–79).

After officers placed Meadows handcuffed in the cell and secured the cell door, Defendant Lieutenant Officer William Bauer (the superior officer on hand) allegedly "approached the cell and deployed OC spray directly into Meadows' face."[1] (*Id.* at #79). Bauer left, only to return a few moments later to allegedly "state[] he was 'going to kill' Meadows."(*Id.*). Meadows (presumably then facing away) alleges Bauer ordered him to turn his face around, at which point Bauer again sprayed Meadows' face with OC spray. (*Id.*). By this point, Meadows says he could have posed no danger to officers, having been handcuffed and placed in a secured strip cell. (*Id.*).

---

[1] To quote the R&R: "The Court understands plaintiff's allegations concerning the use of 'OC spray' to mean Oleoresin [Capsicum] pepper spray—a chemical agent used by SOCF correctional officers." (Doc. 30, #182).

3

Following the incident, Meadows claims he pursued grievance procedures, but became fearful of further harm after receiving threats from officers like "this is not over," and "[you] did that to the wrong lieutenant."[2] (*Id.* at #80). According to Meadows, some two months later, on July 31, 2019, Plowman filed a "fabricated Conduct Report" against him, accusing Meadows of conspiring to murder a SOCF corrections officer. (*Id.*). Meadows denies having made such statements or plans, yet he still faced a Serious Misconduct Panel hearing that sentenced him to 24 months in Extended Restrictive housing. (*Id.* at #80–81).

On May 13, 2021, Meadows filed this action, asserting multiple claims against Coppick, Plowman, Kinner, Boyd, Smith, and Bauer. Now in his Second Amended Complaint, Meadows claims:

> **Count One:** 42 U.S.C. § 1983 Claim for Cruel and Unusual Punishment and Excessive Force against Defendant Officers C. Coppick, K. Plowman, J. Kinner, C. Boyd, D. Smith, and William Bauer

> **Count Two:** 42 U.S.C. § 1983 Claim for Supervisory Liability against Defendant Lieutenant William Bauer

> **Count Three:** 42 U.S.C. § 1983 Claim for First Amendment Retaliation against Defendant Plowman

(*Id.* at #81–85). Moreover, within Count One, Meadows articulated both an excessive use of force claim and a failure to intervene claim against all Defendants. (*Id.* at #81–82). Meadows seeks monetary damages, declaratory and injunctive relief, and fees and costs. (*Id.* at #85).

---

[2] At this juncture, the record does not yet reflect what Meadows allegedly "did" to the Lieutenant. It is also unclear whether these comments referred to the May 19 altercation or Meadows' attempts to pursue grievance procedures.

On December 30, 2021, Defendants moved for judgment on the pleadings, asking the Court to dismiss Meadows' entire suit. (Doc. 22). First, Defendants argued officers only used force in a good faith effort to regain order in the wake of the fight. (*Id.* at #125). Focusing on the subjective element of an Eighth Amendment claim, Defendants argued Meadows failed to provide any facts to imply malicious or bad faith intent, making Meadows' excessive use of force claim legally insufficient. (*Id.*). Second, Defendants argued Meadows' "failure to intervene" claim failed because, even assuming his rights were violated, Meadows made no showing the officers had the opportunity or means to prevent that violation. (*Id.* at #129). Moreover, Defendants contended no failure to intervene claim could survive qualified immunity. (*Id.*). Third, Defendants claimed Meadows pled insufficient facts to support his failure to supervise claim against Bauer, and again any such allegation could not survive qualified immunity. (*Id.* at #132). Finally, Defendants argued Meadows did not substantiate his claim that Plowman filed the Conduct Report with intent to retaliate, and again asserted qualified immunity. (*Id.* at #134–35). Separately, Defendants argued Meadows cannot receive damages from Plowman for mental or emotional injuries arising from the alleged retaliation. (*Id.* at #139). Of note, Defendants did not assert a qualified immunity defense on Meadows' claim for excessive use of force.

For his part, Meadows responded that he had sufficiently pled all necessary allegations in his Second Amended Complaint. (Resp., Doc. 24, #147). Further, Meadows argued that at this early stage, qualified immunity should not bar his

claims, but instead they should proceed to discovery. (*Id.* at #154). Finally, Meadows contended that precedent allows him to receive money damages for his retaliation claim. (*Id.* at #159).

On August 3, 2022, the Magistrate Judge issued her R&R. (Doc. 30). First, the R&R found Meadows pled sufficient facts to state a claim for excessive use of force against Coppick, Plowman, Kinner, Boyd, and Bauer, pointing out that many of Meadow's allegations of excessive force arose *after* officers had escorted him away from the fight. (*Id.* at #186). Therefore, Defendants could not fully excuse their conduct based on a need to restore order. Moreover, Meadows alleged Bauer deployed OC spray only after Meadows had been fully restrained in a cell, raising an inference of malicious and sadistic intent. (*Id.* at #188). On the other hand, the R&R found Meadows failed to state an excessive use of force claim against Smith, who Meadows accused only of using leg irons, a routine and necessary occurrence in a prison. (*Id.* at #189).

Second, the R&R found Meadows stated a plausible Eighth Amendment failure to intervene claim against Coppick, Plowman, Kinner, Boyd, and Smith. (*Id.* at #190). In particular, Meadows pled facts allowing one to "reasonably infer that defendants Coppick, Plowman, Kinner, and Boyd were present and, when not themselves actively engaged in a use of force, watched each other use force against plaintiff." (*Id.* at #191). Moreover, Meadows adequately alleged that Smith witnessed Kinner place his knee on Meadows' head without intervening. (*Id.*). By contrast, the R&R found Meadows failed to allege facts sufficient to plausibly state this claim against Bauer. (*Id.* at

6

#192). While Meadows claimed "Bauer stood by while subordinate Defendant Officers beat" Meadows, (Doc. 17, #79), the R&R determined this "conclusory unadorned the defendant-unlawfully-harmed-me accusation" fell short of stating a plausible claim. (Doc. 30, #192 (cleaned up)). Because Meadows failed to specifically describe which unlawful acts Bauer witnessed and failed to stop, the R&R found his allegations too threadbare to support this claim. (*Id.*). Turning to qualified immunity, the R&R held that Coppick, Plowman, Kinner, Boyd, and Smith each plausibly violated clearly established law by allegedly failing to intervene on Meadows' behalf. (*Id.* at #194).

Third, the R&R found Meadows did not adequately plead a claim for supervisory liability against Bauer. (*Id.* at #195). While Meadows claimed Bauer "stood by while subordinate Defendant Officers beat" Meadows, (Doc. 17, #79), he failed to articulate Bauer's direct involvement or acquiescence in his subordinate's actions, as needed to support a claim for supervisory liability. (R&R, Doc. 30, #196). The R&R pointed out that, in Meadows' Second Amended Complaint, the first mention of Bauer occurs well after the allegations detailing the hallway attack. (*Id.*; 2d Am. Compl., Doc 17, #79). Absent more specificity, the R&R found this allegation insufficient to plausibly state a claim. (Doc. 30, #196–97).

Finally, the R&R determined that Meadows failed to plausibly allege a retaliation claim against Plowman. (*Id.* at #200). The R&R found that Meadows did not state facts to connect the events of May 19, 2022, with Plowman's Conduct Report filed over two months later. (*Id.*). Thus, the R&R concluded Meadows did not credibly allege Plowman had a retaliatory motive in filing the report. (*Id.*).

The R&R further specifically informed the parties that they must file any objections to the R&R within fourteen days of being served with a copy. (Doc. 30, #202). Shortly after issuing the R&R, though, the Magistrate Judge granted the parties' joint request to extend the time for filing objections. Thereafter, Meadows timely filed objections on September 14, 2022. (Objs., Doc. 33). There, Meadows objected to the R&R's proposed dismissal of his failure to intervene claim against Bauer, his supervisory liability claim against Bauer, and his retaliation claim against Plowman. (*Id.* at #207). Meadows did not object to the R&R's recommended dismissal of his excessive use of force claim against Smith. No Defendant objected to the R&R.

## LEGAL STANDARD

Under Fed. R. Civ. P. 72(b)(3), courts review an R&R de novo after a party files a timely objection. This review, however, applies only to "any portion to which a proper objection was made." *Richards v. Colvin*, No. 2:12-cv-748, 2013 WL 5487045, at *1 (S.D. Ohio Sept. 30, 2013). In response to such an objection, "[t]he district court 'may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.'" *Id.* (quoting Fed. R. Civ. P. 72(b)(3)). By contrast, if a party makes only a general objection, that "has the same effect[] as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991); *Boyd v. United States*, No. 1:16-cv-802, 2017 WL 680634, at *1 (S.D. Ohio Feb. 21, 2017). That is, a litigant must identify each issue in the R&R to which he or she objects with sufficient clarity that the Court can identify it, or else that issue is deemed forfeited. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir.

8

1995) ("The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious.").

Even as to unobjected portions of an R&R, however, the Court nonetheless has an obligation to review the recommendation. In particular, the advisory committee notes to Federal Rule of Civil Procedure 72(b) suggest that the Court still must "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *See Redmon v. Noel*, No. 1:21-CV-445, 2021 WL 4771259, at *1 (S.D. Ohio Oct. 13, 2021) (collecting cases).

Beyond that, the R&R here evaluated Defendants' Motion for Judgment on the Pleadings, so another legal standard comes into play. A court analyzes a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) in much the same manner as a motion to dismiss under Rule 12(b)(6). *See Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). This means the court construes the nonmoving party's pleadings in the light most favorable to it, accepts as true the allegations contained therein, and draws all reasonable inferences in the nonmoving party's favor. *See Bullington v. Bedford County*, 905 F.3d 467, 469 (6th Cir. 2018). The court should grant the motion only if, having done all this, the court nevertheless finds that there is no issue of material fact and the moving party is entitled to judgment as a matter of law. *Bickley v. Dish Network, LLC*, 751 F.3d 724, 733 (6th Cir. 2014). Accordingly, when the moving party is a defendant, a plaintiff need only provide the same "short and plain statement of the claim showing that the pleader is entitled to relief" that would suffice to survive a motion to dismiss under Rule

9

12(b)(6). *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).

That said, the short and plain statement must offer more than mere "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). There must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). This means a complaint must contain "either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Id.* (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)). In sum, an action will be dismissed under this standard where "there is no law to support the claims made." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.*

## LAW AND ANALYSIS

Meadows raises three objections to the R&R. (Objs., Doc. 33, #207). He asks the Court to reject the R&R to the extent it recommends dismissing (1) his failure to intervene claim against Bauer, (2) his supervisory liability claim against Bauer, and (3) his retaliation claim against Plowman. (*Id.*). The Court addresses the objections

in that order. (As for the unobjected portions of the R&R, the Court has reviewed them, and finds no clear error.)

## A.  The Court Finds That Meadows Presents A Plausible Failure To Intervene Claim Against Bauer.

In his Second Amended Complaint, Meadows provides sufficient allegations to state a plausible failure to intervene claim against Bauer. Moreover, for purposes of Defendants' Motion for Judgment on the Pleadings, this claim survives a qualified immunity defense.

"[A] correctional officer who observes an unlawful beating may … be held liable under § 1983 without actively participating in the unlawful beating." *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990). To state an Eighth Amendment failure to intervene claim, plaintiff must demonstrate both that the defendant "'observed or had reason to know that excessive force would be or was being used' *and* 'had both the opportunity and the means to prevent the harm from occurring.'"[3] *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)); *see also Partin v. Parris*, No. 17-6172, 2018 WL 1631663, at *2–3 (6th Cir. Mar. 20, 2018); *Briggs v. Miles*, No. 15-1386, 2017 WL 2174252, at *3–4 (6th Cir. Mar. 6, 2017).

---

[3] The Court acknowledges that *Burgess* and *Turner* are Fourth Amendment failure to intervene cases (i.e., involving seizures by police), but the Sixth Circuit has incorporated this precedent into the Eighth Amendment failure to intervene context (i.e., discipline by corrections officers). *See, e.g., Partin v. Parris*, No. 17-6172, 2018 WL 1631663, at *2–3 (6th Cir. Mar. 20, 2018); *Briggs v. Miles*, No. 15-1386, 2017 WL 2174252, at *3–4 (6th Cir. Mar. 6, 2017).

Consistent with that standard, an officer's fleeting presence at the scene is not enough. *Burgess*, 735 F.3d at 475. Rather, "[t]he critical inquiry is whether the incident lasted long enough to give defendants the opportunity to perceive what was going on and intercede to stop it." *Lesowitz v. Tittle*, No. 5:17-cv-2174, 2019 WL 3006428, at *7 (N.D. Ohio July 10, 2019) (citing *Burgess*, 735 F.3d at 475). Ten seconds or less observing unlawful force in a single setting will not establish liability for an officer's failure to intervene, while twenty-six seconds can. *Compare Alexander v. Carter for Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018), *with Goodwin v. City of Painesville*, 781 F.3d 314, 318, 328 (6th Cir. 2015). But beyond a single incident, observing repeated instances of unlawful force, even of short duration, also can give an officer the means and opportunity to intervene. *See Pennington v. Terry*, 644 F. App'x 533, 548 (6th Cir. 2016) (dismissing the claim because plaintiff made "no allegation that he was tased multiple times or otherwise suffered a [sic] 'a prolonged application of force'").

To support Meadows' failure to intervene claim against Bauer, the Second Amended Complaint alleges, in full, "Defendant Bauer stood by while subordinate Defendant Officers beat Meadows."[4] (2d Am. Compl., Doc. 17, #79). No doubt, this is a slender reed on which to assert failure to intervene against Bauer. That said, the Court's role at this time is to assume true all factual allegations, and then assess

---

[4] Meadows claims to have prison security video footage that places Bauer within the hallway at the same time his subordinate officers beat Meadows. (Objs., Doc. 33, #209). Because the Court has yet to see this video, the Court cannot, and does not, rely on its alleged contents here. Still, if the video exists and indeed depicts Bauer's presence in the hallway, such a video would support Meadows' claim that Bauer witnessed and ignored the assault.

whether Meadows sets forth a plausible claim. *See Iqbal*, 556 U.S. at 678. Here, the Court finds Meadows has done so, if barely. Assuming Bauer in fact "stood by" while the described events unfolded, it is entirely plausible to infer that Bauer "observed" the beatings and "had both the opportunity and the means to prevent" them. *Burgess*, 735 F.3d at 475. In common parlance, asserting someone "stands by" while something occurs usually means the person witnessed the events in question from close proximity. A natural reading of the allegations against Bauer, then, suggests that Bauer was present for, and fully aware of, his subordinate officers' actions. To be sure, Meadows does not say how long Bauer observed the alleged abuse. But, giving Meadows the benefit of the doubt, and thus assuming Bauer's presence throughout, the chain of events here certainly seems to have stretched beyond the minimum time necessary to support a failure to intervene claim.

The R&R suggests a different result, highlighting Meadows' failure to identity what specific violent act by what specific officer Bauer observed. (Doc. 30, #192). Focusing on Meadows' one-sentence accusation, the R&R concludes that his "conclusory 'unadorned, the defendant-unlawfully-harmed-me accusation[s]' cannot survive a motion for judgment on the pleadings." (*Id.* (quoting *Iqbal*, 556 U.S. at 677–78)). The Court respectfully disagrees. Meadows asserts a fact, not a conclusion. It would be one thing if Meadows offered merely an unadorned legal conclusion—"Bauer violated my constitutional rights by failing to intervene." That would not suffice. But here, Meadows alleges a fact—Bauer "stood by while subordinate Defendant Officers beat" him—and does so within the context of a broader discussion detailing the

13

alleged violence. (2d Am. Compl., Doc. 17, #79). The Court agrees that Meadows could have more explicitly detailed Bauer's involvement, but at bottom, Meadows alleges that Bauer observed his subordinates undertake the described beating of Meadows. To actually prevail on his claim against Bauer, of course, he will need to prove this fact, and provide much more detail regarding Bauer's presence, knowledge, and involvement. But Meadows has offered enough for now.

In arriving at this result, the Court acknowledges that Bauer's name fails to appear in Meadows' narrative until after Meadows arrived at the strip cell. (2d Am. Compl., Doc. 17, #79). That is, Meadows names various officers who allegedly participated in the violence against him in the hallway, while Bauer's name first appears when Meadow describes him as using OC spray. (*Id.*). The R&R takes this to suggest, at least tacitly, that Bauer did not witness the hallway incident. (Doc. 30, #192). But the Court concludes the Second Amended Complaint should not be read that narrowly. Regardless of the order in which the facts appear on the page, Meadows ultimately alleges Bauer "stood by" *while the beatings occurred*. And for the reasons described, the Court concludes that this allegation plausibly suggests Bauer witnessed those events, even if Bauer's first action explicitly directed at Meadows did not occur until Meadows entered the strip cell.

Finally, the Court determines that Bauer is not entitled to qualified immunity at this stage. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court must ask whether defendants' actions violated a constitutional right, and whether that right was "clearly established" at that time. *Id.* at 232. "The 'dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Qualified immunity presents a fact-sensitive analysis, making it generally a "bad fit" for a motion to dismiss based on the pleadings. *Siefert v. Hamilton County*, 951 F.3d 753, 761 (6th Cir. 2020); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring in part) (recognizing dismissal based on the pleadings "is a mismatch for [qualified] immunity and almost always a bad ground of dismissal"). "Without more than the complaint to go on, the court 'cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent,' making qualified immunity inappropriate." *Siefert*, 951 F.3d at 761 (quoting *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019); *Moderwell v. Cuyahoga County*, 997 F.3d 653, 661 (6th Cir. 2021) ("[I]t is generally inappropriate for a ... court to grant a [12(c) motion for judgment on the pleadings] on the basis of qualified immunity."). Instead, courts typically recognize that summary judgment, not a Rule 12 motion, presents the earliest point when dismissal for qualified immunity is proper. *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015); *Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)

15

(recognizing it is "difficult for a defendant to claim qualified immunity on the pleadings *before discovery*" (emphasis in original)). To be clear, though, "this is only a 'general preference,' not an absolute one." *Siefert*, 951 F.3d at 761. If plaintiffs present clearly "'insubstantial claims' against government officials," qualified immunity should "be resolved prior to discovery." *Pearson*, 555 U.S. at 231 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)); *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016).

The Court finds that Meadows' failure to intervene claim against Bauer can plausibly survive a qualified immunity defense. As the R&R correctly notes in its analysis of the other Defendants, a corrections officer who observes another using excessive force, and who has the means and opportunity to intervene, violates clearly established constitutional law. (Doc. 30, #194 (citing *Burgess*, 735 F.3d at 475; *Turner*, 119 F.3d at 429; *Alexander v. Carter for Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018); *Partin*, 2018 WL 1631663, at *3)). Therefore, Meadows' allegations, if proven, may defeat Bauer's qualified immunity defense. Indeed, to quote the Sixth Circuit, "[w]e have repeatedly denied qualified immunity when officers observe the use of excessive force yet fail to intercede." *Kulpa for Estate of Kulpa v. Cantea*, 708 F. App'x 846, 854 (6th Cir. 2017). Of course, at this stage, the Court bases this finding only on the pleadings—Bauer may certainly reassert a qualified immunity defense as the facts develop. For example, other than proving Bauer's presence in the hallway, how long he observed the incident will also be probative in determining whether he had the means and opportunity to intervene. But that is a question for another day. At

16

this stage, the Court finds that Meadows' failure to intervene claim against Bauer, based on his allegations in the Second Amended Complaint, survives a qualified immunity challenge. *See Moderwell*, 997 F.3d at 661.

**B.**    **The Court Finds That Meadows Presents A Plausible Supervisory Liability Claim Against Bauer.**

For many of the same reasons, Meadows also states a plausible supervisory liability claim against Bauer. And again, Meadows' claim against Bauer survives a qualified immunity defense for purposes of Defendants' Motion for Judgment on the Pleadings.

"[A] supervisor may be liable under § 1983 if he 'abandon[s] the specific duties of his position ... in the face of actual knowledge of a breakdown in the proper workings of the department.'" *Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). Different from respondeat superior, liability only attaches "where some 'execution of the supervisors' job function result[s] in [the p]laintiff's injury.'" *Id.* (*Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)). Mere inadequate supervision is not enough. *Id.* Instead, the defendant must have abdicated a responsibility to *actively* perform a supervisory duty. *Id.* "In short, a plaintiff must plausibly allege that a supervisory defendant 'authorized, approved, or knowingly acquiesced in the unconstitutional conduct … of his subordinates through the execution of his job functions.'" *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016)). Finally, the plaintiff must

17

demonstrate the supervisor's "challenged conduct [is] both a cause in fact and a proximate cause of the alleged injury." *Id.* at 762.

Applying that standard on the alleged facts here, the same inaction that gives rise to a plausible failure to intervene claim also supports a supervisory liability claim. Indeed, if Meadows proves Bauer's presence while the beatings occurred, the "supervisory liability" claim would essentially be a form of duty to intervene claim. That is, a supervisor has a duty to intervene to stop unjustified violence by his or her subordinates occurring in the supervisor's presence, and failing to do so would be an abdication of his or her supervisory role. *See Crawford*, 15 F.4th at 761–62.

And again, qualified immunity does not sink Meadows' supervisory liability claim against Bauer, at least not for now. Assuming Meadows' allegations are true, Bauer witnessed his subordinate officers intentionally inflict pain on Meadows, before Bauer himself sprayed Meadows with OC spray. For a supervisor to witness subordinates engage in gratuitous violence against an inmate and then join the conduct himself certainly violates clearly established law. *See Alexander*, 733 F. App'x at 263 (explaining that a supervisor's encouragement or participation can make out a claim). Of course, discovery may show this never happened, or that Bauer himself did not have notice of his subordinates' conduct. But at this stage, Meadows' Second Amended Complaint states facts that create a plausible claim for supervisory liability against Bauer. *See Moderwell*, 997 F.3d at 661.

18

**C.**     **The Court Finds That Meadows Presents A Plausible Retaliation Claim Against Plowman.**

Meadow's Second Amended Complaint also states, once again barely, a plausible retaliation claim against Plowman. And that claim likewise survives a qualified immunity defense at this stage of the proceedings. Finally, Meadows may pursue monetary damages under this claim.

A prison official engages in unlawful retaliation if he or she punishes an inmate for engaging in conduct the First Amendment protects. *Jones v. Caruso*, 421 F. App'x 550, 553 (6th Cir. 2011). To make out a retaliation claim, an inmate must allege (and then show): "(1) the prisoner engaged in protected conduct; (2) an adverse action was taken against the prisoner that 'would deter a [prisoner] of ordinary firmness from continuing to engage in that conduct'; and (3) a causal connection exists between the first two elements—i.e., the prisoner's protected conduct motivated, at least in part, the adverse action." *Id.* (quoting *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007)). "Filing a grievance," i.e., Meadows' conduct here, "is protected conduct under the First Amendment." *Id.* But the protected conduct also must be a "substantial or motivating factor" in the alleged retaliation. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).

As the Sixth Circuit has noted, retaliatory motive is difficult to prove through direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005). Instead, when found, retaliatory motive is often shown by circumstantial evidence, and usually presents "a factual issue to be resolved by a jury." *Maben v. Thelen*, 887 F.3d 252, 267 (6th Cir. 2018) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 519–20 (6th Cir.

2008)). That said, "conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)).

In some circumstances, temporal proximity (i.e., the time between the protected conduct and the alleged retaliation) can contribute to an inference of retaliatory motive. *Kirschke v. Chance*, No. 19-2324, 2020 WL 6703843, at *3 (6th Cir. July 21, 2020). For example, proximity of six months or less may support a finding of causation. *See id.*; *Nguyen v. City of Cleveland*, 229 F.3d 559, 566–67 (6th Cir. 2000). Even then, though, the Court still must look at temporal proximity in context, also considering the other direct and circumstantial evidence alongside the defendant's version of events. *See Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012); *Nguyen*, 229 F.3d at 567.

Whether temporal proximity *alone*, or at least without much else, would be enough to plausibly establish a retaliatory motive sufficient to survive a motion to dismiss, however, is less than clear. *Compare Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 632 (6th Cir. 2013), *Paige v. Coyner*, 614 F.3d 273, 283 (6th Cir. 2010) (holding that temporal proximity can "create an inference of retaliatory motive" sufficient to survive a Rule 12(b)(6) motion), *and Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004), *with Hill v. Lappin*, 630 F.3d 468, 476 (6th Cir. 2010) ("Although this court has concluded that evidence of temporal proximity between filing grievances and the adverse action provides some support for establishing retaliatory motive, it has been reluctant to find that such evidence alone establishes

20

retaliatory motive."), *and Skinner v. Bolden*, 89 F. App'x 579, 579–80 (6th Cir. 2004). Indeed, at least one other opinion in this circuit has previously noted this apparent tension. *See Hairson v. Maria*, 2:18-cv-378, 2018 WL 6628977, at *10 (S.D. Ohio Dec. 19, 2018).

This Court's review of the competing cases, though, suggests that the better view is that temporal proximity can, at least in some circumstances, plausibly support a retaliatory motive sufficient to withstand a motion to dismiss in this circuit. *Top Flight Entertainment* perhaps offers the most fulsome discussion of the issue. 729 F.3d 623, 632 (6th Cir. 2013). The panel there tackled the plausibility question head on: "[A]lthough temporal proximity may not be enough to ultimately sustain Plaintiffs' allegations, it is sufficient at [the motion to dismiss] stage to render Plaintiffs' claims plausible." *Id.* Moreover, the decision draws support from another Sixth Circuit case, *Paige v. Coyner. See Top Flight*, 729 F.3d at 632 (citing *Paige*, 614 F.3d at 283)). In *Paige*, the court reversed a district court's dismissal of a retaliation claim, at least in part, for *failing* to fully credit temporal proximity. *Paige*, 614 F.3d at 283. According to that court, "[t]emporal proximity between the protected conduct and the adverse action by the state actor 'alone may be significant enough to constitute indirect evidence ... to create an inference of retaliatory motive.'" *Id.* (citing *Muhammad*, 379 F.3d at 417–18). And in *Muhammad v. Close*, the case on which *Paige* relied for this point, the Sixth Circuit remanded a prison grievance retaliation case with instructions that the district court consider whether "temporal proximity

alone" may be sufficient to defeat even a motion for summary judgment. 379 F.3d at 418.

The cases rejecting reliance on temporal proximity as a key factor are less convincing. To be sure, *Skinner* was also a motion to dismiss case, and its language seems definitive: "Without more, however, [plaintiff's] conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." 89 F. App'x at 579–80. But the cases on which *Skinner* relies for that proposition were reviewing summary judgment decisions. *Id.* (citing first, *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001), then *Kensu v. Haigh*, 87 F.3d 172, 175–76 (6th Cir. 1996)). Of course, the review on a fully developed factual record differs from the review that applies at the pleadings stage—yet the *Skinner* court never addresses this difference. Moreover, *Skinner* also referenced the plaintiff's "conclusory allegations," perhaps suggesting it was something about *how* the plaintiff in that case alleged temporal proximity that warranted dismissal, as opposed to the role of temporal proximity more generally. And, finally, it bears noting that *Skinner* is unpublished, while *Top Flight* is not. Moreover, while *Hill* (cited above) is a published opinion, it merely notes a "reluctance" to rely on evidence of temporal proximity, not an outright prohibition. 630 F.3d at 476.

In sum, the Court concludes that temporal proximity may, in some circumstances, give rise to a plausible inference of retaliatory intent sufficient to survive a motion to dismiss on the pleadings.

Here, Meadows alleges that Plowman retaliated against him for attempting to file a grievance against Plowman and others after the events of May 19, 2019. (2d Am. Compl., Doc 17, #80–81). Specifically, Meadows claims:

> 40. Meadows immediately began attempts to access the grievance procedure at SOCF to address the May 19, 2019 incident.
>
> 41. Meadows experienced threats from prison staff following the attack, including correctional officers telling Meadows "this is not over," "[Meadows] did that to the wrong lieutenant," and other statements.
>
> 42. Meadows understood these statements from correctional officers as threats to his physical safety.
>
> 43. On July 31, 2019, approximately two months after the use of force against Meadows, Defendant Plowman filed a fabricated Conduct Report against Meadows.
>
> 44. In the fabricated report, Defendant Plowman falsely claimed he overheard Meadows and another inmate making threatening statements regarding the murder of a corrections officer.
>
> 45. Meadows did not participate in any such conversation regarding the murder of a corrections officer.
>
> 46. Meadows did not make threats to harm a corrections officer.
>
> 47. Based solely on the July 31, 2019 Conduct Report of Defendant Plowman, Meadows was subject to a hearing by the Serious Misconduct Panel and penalized to 24 months in Extended Restrictive Housing, with a prospective end date of July 31, 2021.
>
> 48. Due to these threats of retaliation and Defendant Plowman's actions, Meadows became extremely concerned for his safety.
>
> 49. Meadows lived in fear that he would be hurt or killed in reprisal for the events of May 19, 2019 and for asserting his right to speak out about and legally challenge the force used against him that day.

(*Id.*).

The Court finds that Meadows' allegations, and again the Court stresses "barely," state a plausible claim for retaliation against Plowman. To start, as already noted, the Sixth Circuit holds that the First Amendment protects an inmate's, like Meadows', use of the grievance process. *Jones*, 421 F. App'x at 553. And if Plowman indeed fabricated a Conduct Report in which he claimed that Meadows threatened to kill a corrections officer, that strikes the Court as the type of adverse action that would deter a similar inmate. Indeed, no one disputes that. Instead, the parties mostly debate whether Meadows has shown retaliatory animus motivated Plowman.

On that front, the Court concludes that Meadows states a plausible claim that a retaliatory motive, at least in part, prompted Plowman to file his report. First, Plowman filed the Conduct Report two months after the events of May 19, well within the six-month outer limit for temporal proximity that the Sixth Circuit has identified as potentially relevant. And, while the timing is by no means dispositive, for all the reasons discussed above, the Court concludes it is at least probative at this stage. *See Top Flight*, 729 F.3d at 632. And second, Plowman's (allegedly fabricated) claim— that Meadows conspired to kill a staff member—is sufficiently extreme to support the notion that Plowman had a retaliatory motive. Indeed, in the Court's view, accusing an inmate of plotting a murder, and a guard's murder at that, is among the gravest charges capable of being leveled against a prisoner. It virtually guarantees a swift and stern response. If Plowman fabricated such a charge (as Meadows alleges), that could plausibly evidence that Plowman intended to punish Meadows, and the timing suggests that punishment may have been for Meadows' grievances. Taken together,

24

these facts plausibly allege that Plowman harbored some retaliatory intent.[5] *See id.*; *Hairson*, 2018 WL 6628977, at \*10.

To be sure, all of this is circumstantial and inferential. As the R&R points out, Meadows does not explicitly allege what grievance steps he took, or whether and when Plowman learned of Meadows' grievance. (Doc. 30, #200). And the R&R is likely correct that the two-month gap between the May 19, 2019, incident and Plowman's filing of the Conduct Report creates at best a weak temporal inference. If Meadows has no more evidence than this at the summary judgment stage, the Court likely would agree that Meadows has not met his burden. Yet looking solely to the pleadings, the Court cannot say, as a matter of law, that Meadows' allegations do not give rise to a plausible inference of retaliatory intent. *See Paige*, 614 F.3d at 283.

The Court likewise concludes that qualified immunity does not bar Meadows' retaliation claim at this time. Courts have clearly established that retaliation in

---

[5] Although no party raised the issue, the Court notes that Meadows' retaliation claim may face another hurdle. In particular, under *Peterson v. Johnson*, 714 F.3d 905 (6th Cir. 2013), the findings of the "Serious Misconduct Panel" may be entitled to preclusive effect. That is, assuming the Serious Misconduct Panel concluded Meadows *did* threaten to murder a guard, that would presumably mean that the Panel also concluded that Plowman *did not* fabricate the Conduct Report. And *Peterson* may require the Court to accept that factual determination as true. If so, it is hard to see how Meadows' retaliation claim, which is predicated on his assertion that Plowman fabricated the charge, can prevail. That said, the Sixth Circuit has also noted that "preclusion cannot be resolved categorically," but instead must be decided based on "case-specific factual questions" and the court's "sense of justice and equity." *Roberson v. Torres*, 770 F.3d 398, 404–05 (6th Cir. 2014) (quoting *Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971)). Moreover, under *Peterson*, a prison misconduct panel's factual findings are only preclusive if the panel "acts in a judicial capacity." *Peterson*, 714 F.3d at 912. It appears that no federal court has yet determined whether an Ohio Department of Rehabilitation and Correction Serious Misconduct Panel meets that threshold. Therefore, based on the pleadings alone, and absent briefing from the parties on the relevant "case-specific factual questions," the Court cannot yet determine if the Panel's factual findings are entitled to preclusive effect here. *See Johnson v. Flaquel*, No. 1:22-cv-784, 2022 WL 4926599, at \*4 n.1 (W.D. Mich. Oct. 4, 2022).

response to First Amendment protected conduct in the prison context violates the Constitution. *See Jones*, 421 F. App'x at 553. Thus, at the level of generality that controls the pleadings stage, the allegations here suffice to prevent application of qualified immunity.

Last, the Court briefly notes that Meadows can pursue compensatory damages against Plowman in his personal capacity for allegedly violating Meadows' First Amendment Rights. Defendants argue that Meadows cannot receive monetary damages for the claimed injuries that arose from Plowman's alleged retaliation here. (Mot. for J. Pleadings, Doc. 22, #136–39). That is so, they say, because under the strictures of § 1997e(e) of the PLRA, a plaintiff can recover only if they first show *physical* injuries, and Meadows did not allege any physical harm arising from the retaliation. (*Id.*). The Defendants' argument does find some support in the PLRA's text. It provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Thus, one can understand why Defendants would argue that Meadows' failure to allege a physical injury dooms this claim. (Mot. for J. Pleadings, Doc. 22, #136–39). And the R&R, which recommended the Court dismiss Meadows' retaliation claim for other reasons, never reached this question. (Doc. 30). The Sixth Circuit, though, has expressly rejected the argument:

> [D]eprivations of First Amendment rights are themselves injuries, apart from any mental, emotional, or physical injury that might also arise from the deprivation, and … § 1997e(e) does not bar all relief for injuries to First Amendment rights.

26

*King v. Zamiara*, 788 F.3d 207, 212 (6th Cir. 2015); *see also Maben v. Thelen*, 887 F.3d 252, 271 (6th Cir. 2018) (permitting an inmate to pursue monetary damages from a corrections officer for First Amendment retaliation). In short, the PLRA's language notwithstanding, an inmate whose First Amendment rights are violated suffers a compensable and recoverable actual injury, even absent another accompanying injury. *King*, 788 F.3d at 213–14.

To be sure, Defendants attempt to distinguish *King*, claiming that Meadows is really demanding compensation for his mental or emotional injuries (e.g., fear, anxiety), not for a constitutional injury. (Doc. 22, #137). But the Court disagrees. Meadows, in describing his retaliation claim, presents it as a constitutional injury, not a mental or emotional injury. (*See* 2d Am. Compl., Doc. 17, #84–85). Under *King*, such an injury is compensable.[6] Therefore, Meadows can pursue monetary damages against Plowman under his retaliation claim, assuming, of course, that Meadows can prove that Plowman indeed retaliated against him.

## CONCLUSION

For the reasons set forth above, the Court **SUSTAINS** Meadows' Objections (Doc. 33) to the R&R (Doc. 30). Accordingly, the Court **ADOPTS IN PART** the R&R (Doc. 30). As a result, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings (Doc. 22) as to all claims except the excessive use of force claim against D. Smith, but **GRANTS** Defendants' Motion (Doc. 22) to the extent it seeks judgment

---

[6] Calculating compensatory damages for Meadows' injury to his First Amendment rights presents a different, and challenging, inquiry. *See King*, 788 F.3d 213–16. For purposes of Defendants' Motion for Judgment on the Pleadings, however, the Court simply notes that *King* permits Meadows to pursue these damages.

on that claim against D. Smith. Meadows may proceed on all other claims as alleged

in his Second Amended Complaint (Doc. 17).

     **SO ORDERED.**

October 25, 2022
**DATE**

         **DOUGLAS R. COLE**
         **UNITED STATES DISTRICT JUDGE**