# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TOMMY MEADOWS,                     Case No. 1:21-cv-322
      Plaintiff,                   Hopkins, J.
                                     Litkovitz, M.J.
      vs.

CORRECTIONAL OFFICER         **REPORT AND**
C. COPPICK, et al.,              **RECOMMENDATION**
      Defendants.

Plaintiff Tommy Meadows brings this prisoner civil rights action under 42 U.S.C. § 1983 against defendants Southern Ohio Correctional Facility ("SOCF") Correctional Officers C. Coppick, K. Plowman, J. Kinner, C. Boyd, D. Smith,[1] and W. Bauer alleging claims of excessive use of force and deliberate indifference in violation of the Eighth Amendment to the United States Constitution. (Doc. 17). Plaintiff also brings a supervisory liability claim against defendant Bauer and a First Amendment retaliation claim against defendant Plowman. (*Id.*). This matter is before the Court on defendants' motion for summary judgment (Doc. 62), plaintiff's response in opposition (Doc. 70), and defendants' reply memorandum (Doc. 71).

## I. Background

The facts relevant to plaintiff's claims against defendants are taken from the proposed stipulation of undisputed facts submitted by defendants (Doc. 61) and plaintiff's response thereto (Doc. 69), the evidence cited in defendants' motion for summary judgment, including video of the relevant events (Doc. 62), the parties' responsive memoranda (Docs. 70, 71), plaintiff's

---

[1] Defendants include the excessive force claims against Smith in their motion arguments, but the Court has already rendered judgment in defendants' favor on that claim. (*See* Doc. 34 at PAGEID 239-40). The only remaining claim against Smith is deliberate indifference to an excessive use of force.

affidavit (Doc. 67), and the affidavit of Madeleine Smith (Doc. 68).[2]

*Chow Hall*

Meadows was incarcerated at SOCF at the time he claims his rights were violated. (Doc. 57 at PAGEID 290-95). On May 19, 2019, Meadows was in line along with other inmates from his housing block to go to the dining or "chow" hall. (Video 4:19:21[3]). Another group of inmates arrived and joined the walk line to the "chow hall." Shortly thereafter, a fight broke out among the inmates in Meadows' immediate vicinity. Several corrections officers responded to the altercation. Defendants state that most of the inmates chose to face the wall on their own, but when correctional officers ordered all of the inmates to move away and face the wall, Meadows did not comply with the orders. (Doc. 62 at PAGEID 1008-09). The video shows some inmates facing the wall (Video 4:20:55 (approximately eight out of 23-25 inmates not involved in the altercation are facing the wall)), while more continue turning to face the wall as correctional officers arrive on scene. (Video 4:21:13 (all inmates are facing the wall except Meadows and those engaged in the altercation)). Meadows eventually faced the wall and was handcuffed. (Video 4:21:40). Meadows denies he was told to face the wall and that he "refuse[d] to be handcuffed." (Doc. 67, Meadows Aff., at PAGEID 1053: ¶ 19). He admits he disobeyed direct orders to lay on the floor because he wanted to speak with correctional officers to inform them he was not involved in the fight. (Doc. 57, Meadows Dep., at PAGEID 306; *see* Video 4:21:20 – 4:21:40).

---

[2] As many of the facts are undisputed and/or confirmed by the video evidence submitted by defendants, citations to the record will be provided only for direct quotes or facts potentially in dispute.

[3] Defendants submitted a manually filed video of SOCF surveillance camera footage that depicts the incidents between Meadows and defendants. *See* Docs. 63, 64.

A correctional officer then escorted Meadows from the corridor where the fight took place to a central control area. (Doc. 62 at PAGEID 1009; Video 4:21:45; *see also* Doc. 57 at PAGEID 307). Upon entering the central control area, Meadows was handed off to defendant Coppick, who continued escorting Meadows to segregation or "J2 block" for disobeying direct orders.[4]

*Sallyport*

The parties dispute whether Meadows was uncooperative during his escort. Defendants claim Meadows was planting his feet and refusing direct orders from defendant Coppick to face forward. (Doc. 62 at PAGEID 1009 (citing Doc. 59, Coppick Dep., at PAGEID 730-35 and Doc. 60, Plowman Dep., at PAGEID 948)). Meadows states he turned his head to speak to defendant Coppick because Coppick "intentionally bent and twisted" Meadows' fingers, causing him pain. (Doc. 67, Meadows Aff., at PAGEID 1053: ¶ 3; Doc. 57, Meadows Dep., at PAGEID 309-11). Defendant Coppick and Meadows entered the "sallyport," a short hallway with a gate at each end, and approached the closed gate at the entrance to "J Corridor." What happened next is disputed. Meadows claims that "[o]nce out of direct view of surveillance cameras and into the [sallyport], [d]efendant Coppick began to painfully twist and bend Meadows'[] fingers and hands in an attempt to punish and injure him while avoiding detection . . . caus[ing] Meadows to squirm." (Doc. 70 at PAGEID 1107 (citing Doc. 57, Meadows' Dep., at PAGEID 310 and Video 4:22:24)). Defendant Coppick claims Meadows turned toward him and spit in his face. (Doc. 62 at PAGEID 1010 (citing Doc. 59, Coppick Dep., at PAGEID 730)). Meadows denies

---

[4] The video capturing the May 19, 2019 incidents does not contain audio. Therefore, whether defendants gave Meadows any direct orders cannot be discerned from the video.

intentionally spitting on any correctional officer that day.  (Doc. 70 at PAGEID 1126 (citing Doc. 67, Meadows Aff., at PAGEID 1051, ¶ 6)).  Defendant Coppick and Meadows began to struggle.  Coppick swung Meadows around, causing Meadows' head to hit the concrete wall before landing on the floor.  (Doc. 71 at PAGEID 1150).  The parties dispute whether defendant Coppick intentionally forced Meadows' head into the wall (Doc. 70 at PAGEID 1108; Doc. 67, Meadows Aff., at 1051 ¶ 8), or whether the impact was incidental to Coppick's attempts to gain control over Meadows.  (Doc. 62 at PAGEID 1010).  The parties also dispute whether defendant Coppick slammed plaintiff's head against the floor.  (Doc. 71 at PAGEID 1150; Doc. 70 at PAGEID 1108; Video 4:22:25 – 4:22:31).

*J Corridor*

Once Meadows was on the ground, defendants Plowman, Boyd, and Smith arrived on the scene, and defendant Smith placed leg irons on Meadows.  Defendants Coppick and Plowman then lifted Meadows from the ground and began escorting him into "J Corridor."  At this point, Meadows was visibly bleeding from head lacerations.  Blood is visible dripping down his face and on the floor where his head was placed.  (Video 4:23:00).  Meadows states he was "concussed, bloodied, and stunned," making his memory of the incident "real blurry."  (Doc. 70 at PAGEID 1108; Doc. 67, Meadows Aff., at 1051 ¶ 8; Video 4:23:05 – 4:23:10).  Defendants assert Meadows was planting his feet and throwing his body back toward defendants Coppick and Plowman.  (Doc. 62 at PAGEID 1010).  Coppick and Plowman maneuvered Meadows up against the wall, which left a smear of blood on the wall tile from Meadows' face.  (Doc. 70 at PAGEID 1109 (citing 4:23:10 –4:23:14)).  Defendants state Meadows then turned toward defendant Coppick and "spat" in his direction (Doc. 62 at PAGEID 1011), which plaintiff denies.

4

(Doc. 70 at 1114 (citing Doc. 57, Meadows Dep., at PAGEID 314, 380 and Doc. 67 at PAGEID 1051, ¶ 6)).

The Parties agree that defendants Coppick and Plowman then took Meadows down to the ground a second time, but they disagree on the amount of force used. Meadows states that when he was "taken to the ground the second time . . . [his] head was again bashed into the concrete floor." (Doc. 67, Meadows Aff., at PAGEID 1051: ¶ 9). Defendants allege they "again used a maneuver to place Meadows on the ground to gain control over his person," and once plaintiff was "placed on the ground, [defendants Coppick, Plowman, Smith, Boyd, and Kinner] individually secure[d] a quadrant of Meadows' person." (Doc. 71 at PAGEID 1152 (citing to Video 4:23:22); Doc. 62 at PAGEID 1006). Defendant Kinner can be seen on the video placing his "right knee on the back of [Meadows'] head," which, according to Kinner, was "to control [Meadows'] head movement." (Doc. 59-1 at PAGEID 785, 848; Video 4:23:18). Defendant Bauer, who was wearing a "white" shirt identifying him as a supervisor, then approached the group carrying a canister of "OC" spray[5] in his hand. (Video 4:23:21). Defendants claim that throughout this part of the encounter, Meadows was making threats to spit on them. (Doc. 62 at PAGEID 1011 (citing Doc. 60, Plowman Depo., at PAGEID 951-52 and Doc. 58, Bauer Depo., at PAGEID 467-69)). Meadows denies making such threats. (Doc. 70 at PAGEID 1126). Meadows states defendants piled on top of him, and defendant Coppick used his left arm to surreptitiously slam Meadows' head into the concrete floor. (Doc. 70 at PAGEID 1108-09 (citing Video 4:23:24); Doc. 67 at PAGEID 1051, ¶ 8).

---

[5] "OC" or Oleoresin Capsicum (pepper) spray is a chemical agent used by SOCF correctional officers.

*Strip Cell*

Defendants then picked up Meadows, who was still handcuffed and shackled, placed him in a "strip cell," and closed the barred door.  Meadows turned around to face defendant Bauer, who was standing several feet away from the cell in the doorway, and Bauer immediately deployed OC spray into Meadows' face.  Meadows states he was turning around to speak to defendant Bauer (Doc. 67, Meadows Aff., at PAGEID 1051, ¶ 10), while defendant Bauer testified Meadows disobeyed orders to face the wall and spit in Bauer's direction, striking Bauer's left cheek.  (Doc. 62 at PAGEID 1011 (citing Doc. 58, Bauer Dep., at PAGEID 472 and Video 4:24:09 – 4:24:14)).  Meadows denies spitting on defendant Bauer.  Once Meadows was secured in the "strip cell," all defendants left the scene to decontaminate from their contact with the OC spray.  Defendants Coppick and Bauer allege they first observed blood and spit on their persons at this time.  (Doc. 62 at 1011).

Approximately four minutes later, defendant Bauer returned to the "strip cell," where Meadows was facing the back wall of the cell.  (*See* Video 4:28:10).  The parties agree that Meadows turned his head toward defendant Bauer, and Bauer deployed OC spray towards Meadows' face.  Meadows testified that defendant Bauer ordered him to turn around (Doc. 57, Meadows Dep., at PAGEID 314); defendant Bauer testified that Meadows threatened to spit on him again and when Meadows started to turn, Bauer sprayed Meadows to prevent him from carrying out his threat.  (Doc. 58 PAGEID 498).

Meadows claims he suffered several injuries from the encounters described above.  These included a concussion, head lacerations, burning and choking from OC spray exposure, finger and knee pain, and mental suffering.  (*See* Doc. 70 at PAGEID 1110 (citing Doc. 67, Meadows

6

Aff., at PAGEID 1050, 1056; Doc. 57, Meadows Dep. 312, 316-17, 319, 321, 323)). Meadows states that defendants' excessive use of force and "[d]efendant Plowman's fabricated reports" resulted in "sustained severe mental injury and suffering" causing Meadows' "paranoia . . . confusion, and an ongoing fear" that he will be subjected to further "assault[s]" and "false allegations." (Doc. 67, Meadows Aff., at PAGEID 1050: ¶ 4). Attached to Meadows' affidavit is a photograph taken immediately after the May 19, 2019 incident showing the injuries to Meadows' face. (Doc. 67, Meadows Aff. Ex. A, at PAGEID 1056).

*Grievances and Non-Exhaustion*

Meadows avers that in the two weeks following the May 19, 2019 incidents, he "repeatedly tried to begin the administrative grievance process by filing an [internal complaint resolution (ICR)]" but "staff consistently refused to allow me access to an ICR form or to file a complaint." (Doc. 67, Meadows Aff., at PAGEID 1051-52: ¶ 11). He later specifies that he "repeatedly tried to obtain and complete an ICR form and submit [his] complaint . . . but SOCF staff denied and otherwise thwarted all of [his] attempts." (Doc. 67, Meadows Aff., at PAGEID 1052: ¶ 17). He states he "completed and submitted three ICR forms between June 2019 and mid-July 2019, that were seemingly 'lost' by SOCF staff." (Doc. 67, Meadows Aff., at PAGEID 1052: ¶ 16). Meadows states he "was first able to fill out a post-May 19, 2019 ICR form on June 6, 2019" but that "SOCF never processed this 'lost' form." (*Id*. at ¶ 17). Meadows submits copies of the two ICRs he allegedly submitted on June 26, 2019 and July 11, 2019 that were "lost"[6] by SOCF staff. (Doc. 67, Meadows Aff., Ex. D. at PAGEID 1065-66).

---

[6] Meadows states that after his first ICR was "lost," he began mailing copies of the ICRs to Smith to "preserve proof that [he] submitted them." (Doc. 67, Meadows Aff., at PAGEID 1053-54, ¶ 26).

Defendants assert Meadows filed his first ICR relating to the May 19, 2019 incidents on July 11, 2019. (Doc. 62 at PAGEID 1014). There is no dispute that Meadows filed ICRs dated July 11, 2019 (Doc. 62 at PAGEID 1014; Doc. 67, Meadows Aff. Ex. D, at PAGEID 1066 (alleging threats against his person for the May 19, 2019 incident)); August 1, 2019 (Doc. 62 at PAGEID 1014; Doc. 67, Meadows Aff. Ex. B., at PAGEID 1058 (describing the May 19, 2019 incidents)); and August 1, 2019 (Doc. 62 at PAGEID 1014; Doc. 67, Meadows Aff. Ex. B., at PAGEID 1059 (complaining about the unavailability of the grievance process)).

In addition to those acknowledged by defendants, Meadows avers he submitted the ICRs dated June 6, 2019 (Doc. 67, Meadows Aff., at PAGEID 1053-54, ¶ 26 (reporting excessive force during the May 19, 2019 incident)); June 26, 2019 (Doc. 67, Meadows Aff. Ex. D, at PAGEID 1065 (stating he had not heard back about his first ICR on his excessive force complaints))[7]; July 31, 2019 (Doc. 67, Meadows Aff. Ex. C, at PAGEID 1062 (claiming staff retaliated against him for the May 19, 2019 incident with Sgt. Bauer by falsely accusing him of threatening to kill a female correctional officer))[8]; August 1, 2019 (Doc. 67, Meadows Aff. Ex. B, at PAGEID 1060 (reporting a correctional officer threatened him when he went to the medical room over the May 19, 2019 incident with Sgt. Bauer)); and August 22, 2019 (Doc. 67, Meadows Aff. Ex. C, at PAGEID 1063 (alleging defendant Plowman retaliated against plaintiff

---

[7] Meadows states he mailed the copies to Madeleine Smith immediately after completing the ICRs in order to preserve proof that he had mailed them. (Meadows Aff., at PAGEID 1053-54, ¶ 26). Meadows states in his June 26, 2019 ICR that his first ICR was sent "5-6-19" and that he never heard a response back. Madeleine Smith suggests in her emails to the Chief Inspector on August 1, 2019, that Meadows may have "dyslexia" and therefore wrote the incorrect date. (Doc. 68, Smith Aff., at PAGEID 1067; *see also* Doc. 57, Meadows Dep., at PAGEID 345-46 (illustrating how Meadows' sometimes inadvertently switches the month and day when communicating dates)).

[8] Meadows further claims in this ICR that he does not have access to a stamp to send the ICR and the housing assignment on the form indicates it was drafted after Meadows was moved to segregated housing. (Doc. 67, Meadows Aff. Ex. C, at PAGEID 1062).

8

for filing grievances over the May 19, 2019 incident involving Plowman)).

Meadows presents the affidavit of Madeleine Smith, a friend with whom he corresponded during the relevant time period.[9]  (Doc. 68, Madeleine Smith Aff.).  Attached to Smith's affidavit are copies of two letters she received from Meadows with corresponding envelopes (Doc. 68, Madeleine Smith Aff. Ex. A, at PAGEID 1069-77)[10]; copies of email chains between Smith and Ohio Department of Rehabilitation and Correction Chief Inspector Chris Lambert dated July 19, 2019 to August 1, 2019 (Doc. 68, Madeleine Smith Aff. Ex. B, at PAGEID 1078-85); and copies of email chains between Smith and Chief Inspector Chris Lambert dated August 21, 2019 to August 26, 2019 (Doc. 68, Madeleine Smith Aff. Ex. C, at PAGEID 1086-89).

*Retaliation Claims*

On August 5, 2019, defendant Plowman filed the following conduct report against Meadows:

> Be advised on [July 31, 2019 at 1:45 PM], I officer Plowman was sitting on constant watch in K2 when I over[heard] inmates Williams 681-989, and Meadows 438-207 K2-24 talking about how they want to get on death row.  During the conversation both inmates stated that the only way to get on death row was to kill someone.  As the conversation continued inmate Williams stated that killing another inmate won't get them placed on death row.  Inmate Williams then stated that they would have to kill a Corrections Officer for the courts to put them on death row.  At this point in the conversation inmate Meadows stated that inmates at Lucasville already tried to kill a male corrections officer and it didn't work. Inmate [M]eadows continued to say that it would have to be a female corrections officer next time because it would be easier.  Both inmates stated just need the right time and the right tools to do it.

(Doc. 60-1, Plowman Ex. 11, at PAGEID 986).

---

[9] Ms. Smith states she began a "romantic relationship" with Meadows in the spring of 2019, and they were "married on November 7, 2022."  (Doc. 68, Madeleine Smith Aff., at PAGEID 1067: ¶ 3-4).

[10] Meadows states he sent letters to Smith discussing the difficulties he experienced and that the letters are attached to the affidavit submitted by Smith.  (Doc. 67, Meadows Aff., at PAGEID 1052: ¶ 15).

9

Meadows denies making the statements alleged by Plowman. (Doc. 67, Meadows Aff., at PAGEID 1053: ¶ 20). He avers that defendant Plowman fabricated the "false reports" to "punish [plaintiff] for, and attempt to dissuade [him] from, reporting the May 19, 2019 assaults," as well as the "threats of death and other harm that [d]efendant Bauer and others made to [plaintiff] after May 19." (*Id.*). Meadows states he was "less than two years away from [his] first opportunity to receive parole" and did not "want to kill a prison guard or be on death row." (*Id.*).

Defendants state defendant Plowman had no knowledge of any attempts by Meadows to grieve or complain about the May 19, 2019 incidents. (Doc. 62 at PAGEID 1013 (citing Doc. 60, Plowman Dep., at PAGEID 958)). Defendant Plowman states he initially filed an incident report on or about July 31, 2019, but filed the conduct report on August 5, 2019, after speaking to an investigator. (Doc. 60, Plowman Dep., at PAGEID 960-61). Meadows pleaded not guilty to the allegations that he threatened to kill a correctional officer. (Doc. 60-1, Plowman Ex. 11, at PAGEID 987). He was subsequently found guilty and sentenced to two years of segregated housing. (Doc. 57, Meadows Dep., at PAGEID 329).

## II.   Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A grant of summary judgment is proper unless the nonmoving party "establish[es] genuinely disputed material facts by 'citing to particular parts of materials in the record . . . or . . . showing that the

materials cited do not establish the absence . . . of a genuine dispute.'" *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 403 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(c)(1)). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)*; Little Caesar Enterprises, Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [the evidence] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011). "In response to a properly supported summary judgment motion, the non-moving party 'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Maston v.*

*Montgomery Cnty. Jail Med. Staff Pers.*, 832 F. Supp. 2d 846, 849 (S.D. Ohio 2011) (quoting

*Sixty Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City*

*of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd*, No.

17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248).  The party who

seeks summary judgment "bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of [the record] which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  To make its

determination, the court "need consider only the cited materials, but it may consider other

materials in the record."  Fed. R. Civ. P. 56(c)(3).  The party opposing a properly supported

motion for summary judgment "may not rest upon the mere allegations or denials of his

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

### a.  Exhaustion of Administrative Remedies

Defendants contend Meadows' ICRs were untimely.  Meadows alleges he was thwarted

by prison staff from filing grievances for his excessive force claims within the fourteen-day time

period required by the prison grievance process, a claim which defendants dispute.  Meadows

also states the Chief Inspector granted him special permission to file his grievances outside of the

fourteen-day window, in accordance with Ohio Admin. Code § 5120-9-31(J), and therefore his

grievances were timely.  (Doc. 70 at PAGEID 1141; *see* Doc. 68, Madeleine Smith Aff. Ex. B &

C, at PAGEID 1079-89).

*Legal Standard*

Exhaustion of administrative remedies "is mandatory under the [Prison Litigation Reform Act] and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "[A] prisoner confined in any jail, prison, or other correctional facility" is barred from filing a lawsuit alleging constitutional violations under 42 U.S.C. § 1983 "or any other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

"A prisoner's failure to exhaust his intra-prison administrative remedies prior to filing suit 'is an affirmative defense under the PLRA.'" *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Jones*, 549 U.S. at 216). "[T]he failure to exhaust 'must be established by the defendants.'" *Id.* (quoting *Napier v. Laurel Cty., Ky.*, 636 F.3d 218, 225 (6th Cir. 2011)). "Because the [d]efendants bear the burden of proof on exhaustion, they bear an initial summary judgment burden [that] is higher in that [they] must show that the record contains evidence satisfying [their] burden of persuasion and that no reasonable jury would be free to disbelieve it." *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019) (quoting *Surles*, 678 F.3d at 455-56) (internal quotations omitted)). Thus, defendants are entitled to summary judgment only if they "establish the absence of a 'genuine dispute as to any material fact' regarding non-exhaustion." *Id.* at 456 (quoting *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)).

The PLRA exhaustion requirement means prisoners must carry out "proper exhaustion" of a grievance. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  To properly exhaust a claim, prisoners must "tak[e] advantage of each step the prison holds out for resolving the claim internally" and follow the "'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quoting *Woodford*, 548 U.S. at 90).  "Proper exhaustion [further] demands compliance with an agency's deadlines . . ." *Woodford*, 548 U.S. at 90.

Exhaustion may be excused where the grievance process is unavailable, which includes: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it" because it is "so opaque" or "so confusing"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Lamb v. Kendrick*, 52 F.4th 286, 292-93 (6th Cir. 2022) (quoting *Ross v. Blake*, 578 U.S. 632, 643-44 (2016)).  In order to rely on the excuse of unavailability of the grievance process, a prisoner must first demonstrate he made "affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable." *Id.* at 293 (citation omitted).

The procedure established for resolving inmate complaints in Ohio, codified in Ohio Admin. Code § 5120-9-31, involves a three-step process.  First, the inmate is required to file an informal complaint with the direct supervisor of the staff member involved within 14 days of the

14

event giving rise to the complaint. Ohio Admin. Code § 5210-9-31(J)(1)[11]. Staff shall respond

within seven days of receipt of the informal complaint. *Id*. Second, if the inmate is dissatisfied

with the response to his informal complaint, or the informal complaint process has been waived,

he may file a notification of grievance with the inspector of institutional services. Ohio Admin.

Code § 5120-9-31(J)(2). The inmate must file a grievance within 14 days from the date of the

informal complaint response or waiver of the informal complaint step. *Id*. The inspector of

institutional services shall provide a written response within 14 days of receipt of the notification

of grievance, and the time to respond may be extended by 14 days with notice to the inmate. *Id*.

If the inmate is dissatisfied with the response, he may undertake the third step of the grievance

process by filing an appeal with the office of the chief inspector within 14 days of the disposition

of the formal grievance. Ohio Admin. Code § 5120-9-31(J)(3). The chief inspector shall

provide a written response within 30 days of receipt of the appeal. *Id*. The chief inspector may

waive the filing or response time limits for good cause. *Id*.

### *Non-Exhaustion of Excessive Force and Supervisory Liability Claims*

Defendants allege Meadows failed to exhaust the administrative remedies available to

him because he (1) failed to complete the first step in the grievance process by not timely filing

his ICR within 14 days of the May 19, 2019 incidents; (2) did not present "credible evidence to

show anyone interfered with his ability to properly complete the grievance process" to establish

the process was "unavailable" to him; and (3) did not adequately identify the involved personnel

---

[11] Ohio Admin. Code § 5210-9-31 was modified effective January 9, 2020. The provisions that are now found at Ohio Admin. Code § 5120-9-31(J)(1)-(3) were previously codified Ohio Admin. Code § 5120-9-31(K)(1)-(3). The administrative grievance provisions that are relevant to this case were not substantively modified.

and their actions in his ICR. (Doc. 62 at PAGEID 1032-33). While defendants make a vague reference to only two of plaintiff's complaints being "escalated to the level of appeal to the Chief Inspector's Office" (Doc. 62 at PAGEID 1014), they do not contend or present any evidence that plaintiff failed to comply with the second and third steps of the grievance process. Therefore, the Court analyzes defendants' motion for summary judgment on the exhaustion question solely on the first step in the grievance process.

*Timeliness, Unavailability, and Content*

Defendants argue that plaintiff's ICRs concerning the May 19, 2019 incidents are untimely, and plaintiff cannot meet the exception for untimeliness by asserting the ICR process was unavailable to him. Defendants assert, "It is undisputed that Mr. Meadows' first attempt to submit an ICR detailing the May 19, 2019, event was on August 1, 2019," and it is therefore "untimely because he did not submit it within fourteen (14) days of the May 19, 2019, event." (Doc. 62 at PAGEID 1032; Doc. 71 at PAGEID 1164, (both citing Doc. 57-1 at PAGEID 420)). In the August 19, 2019 ICR, Meadows states he "first attempted to submit an ICR on June 6, 2019." According to defendants, even giving Meadows the benefit of the earlier ICR date of June 6, 2019, the ICR would still be four days outside of the 14-day deadline under Ohio Admin. Code § 5120-9-31(J)(1). Defendants also assert that Meadows "cannot present any credible evidence to show anyone interfere with his ability to properly complete the grievance process." (Doc. 62 at PAGEID 1032).

Even assuming the ICRs actually received from Meadows were untimely, Meadows has presented evidence creating a genuine issue of fact on whether his efforts to comply with the first step of the prison grievance process was thwarted by prison officials. *See Lamb*, 52 F.4th at 292-

93. According to Meadows' affidavit and responsive memorandum, he "completed and submitted three ICR forms between June 2019 and mid-July 2019, that were not properly processed by prison staff and which the Chief Inspector confirmed there was "no record of." (Doc. 67, Meadows Aff., at PAGEID 1052; Doc. 68, Madeleine Smith Aff. Ex. B, at PAGEID 1081; *see also Coopwood v. Wayne Cnty., Michigan*, 74 F.4th 416, 423 (6th Cir. 2023) (noting that a prison having no record of an inmate's grievance was "not inconsistent" when inmate claims prison staff "thwarted" the inmate's attempts to "file a grievance by refusing to provide [the inmate] with the necessary form"). Meadows states that after the first ICR he completed was lost by SOCF staff, he began mailing copies of his completed ICRs to Ms. Smith to "preserve the proof that [he] had submitted them." (Doc. 67, Meadows Aff., at PAGEID 1054). Meadows also provided copies of the June 26, 2019 and July 11, 2019 ICRs that were mailed to Ms. Smith. (Doc. 67, Meadows Aff. Ex. D, at PAGEID 1063-66; Doc. 68, Madeleine Smith Aff. Ex. A, at PAGEID 1069-77).

The Sixth Circuit has held that "administrative remedies are not 'available' if prison employees refuse to provide inmates with necessary grievance forms when requested." *Lamb*, 52 F.4th at 297. Therefore, if the statements in Meadows's affidavit are taken as true, "they would at least create a dispute of fact regarding whether prison officials at [the jail] failed to follow their own procedures and thwarted [Meadows's] affirmative efforts to comply." *Id.* While defendants in this case challenge Meadows's compliance with the initial step of the grievance process, and the *Lamb* Court examined the plaintiff's affirmative efforts to comply with step two of the grievance procedure, the facts are very similar. Noting that the defendants ultimately bore the burden of production and persuasion on their exhaustion affirmative defense,

the *Lamb* Court found the plaintiff's allegations that he was repeatedly refused requests for grievance forms while confined to restrictive housing to be sufficiently specific facts. *Id.* The Court further held that the defendants had not presented any evidence, let alone any irrefutable evidence, demonstrating that prison officials did in fact provide Lamb with grievance forms when he requested them.

Meadows asserts in his affidavit that he "repeatedly tried" to file an ICR but prison staff "consistently refused to allow [him] access to an ICR form or to file a complaint." (Doc. 67, Meadows Aff., at PAGEID 1052). Meadows states that the June 6, 2019 ICR was the "first time he was given the opportunity to actually complete an ICR form and submit it." (*Id.*; Doc. 70 at PAGEID 1139). While Meadows did not name the prison staff members that refused to provide him with the proper forms, he provides evidence as to his affirmative efforts to file a grievance, in addition to his affidavit, which support his assertions that they were unavailable to him. *See Napier*, 636 F.3d at 224. Meadows points to letters he exchanged with his then-girlfriend, Madeleine Smith, describing his difficulties filing an ICR while in restrictive housing. (Doc. 67, Meadows Aff., at PAGEID 1052; Doc. 68, Madeleine Smith Aff. Ex. A, at PAGEID 1069-77). One such letter postmarked May 23, 2019, and to which Ms. Smith attests to receiving, states, "I did not [file an informal complaint]. I still don't have one[.] They will not pass none out that's always a[n] issue as we[ll] as just coming up missing once they are sent to the [institutional] inspector." (Doc. 68, Madeleine Smith Aff. Ex. A, at PAGEID 1070). In another letter postmarked June 7, 2019, and to which Ms. Smith attests to receiving, Meadows writes, "[I]t is hard to get anything [sic] a INFORMAL COMPLAINT which I still have not gotten so they keep

doing that on purpose[] . . . but I will still do it even though it will be long overdue by the time I ever get one."  (Doc. 68, Madeleine Smith Aff. Ex. A, at PAGEID 1074).

There is also evidence in the record indicating Ms. Smith attempted to act as an intermediary for Meadows by contacting the ODRC Chief Inspector's office on multiple occasions about Meadows' denial of access to ICR forms.  (*Id.*, Ex. B).  In an email on June 29, 2019, the Chief Inspector states, "The grievance database for SOCF does not show that Meadows has filed an ICR in 2019; but, as you have alleged access issues, that is what you expected to find.  However, I have taken steps to ensure he has access to the informal complaints and has an opportunity to voice his concerns about staff action, to include staff actions from May 19, 2019." (*Id.* at 1081; *see also* Disposition of Grievance, Doc. 57-1 at PAGEID 426-27).  On August 1, 2019, Ms. Smith avers in an email to the Chief Inspector that Meadows mailed her a copy of the ICR he attempted to file an ICR on June 26, 2024, and that she scanned and emailed it to herself on July 4, 2024, seemingly to document its existence.  (Doc. 68, Madeleine Smith Aff. Ex. B, at PAGEID at 1084).

Meadows' evidence shows he made "affirmative efforts" to comply with the first step of the prison grievance procedure in this case but he was thwarted in those effort by prison officials. While defendants present evidence that Meadows had "sufficient access to individuals making rounds who could assist him in submitting grievance forms," including "medical and mental health personnel" (Doc. 62 at PAGEID 1032-33, citing Doc. 57 at PAGEID 330 to 336), viewing Meadows' deposition testimony in context indicates that while he had contact with prison medical staff, at least some of his attempts to communicate were restricted.  (*See* Doc. 57 at

PAGEID 333-35).  Meadows' evidence creates a genuine issue of fact on whether he was

thwarted in his efforts to timely file ICRs relating to the May 2019 incidents.

Moreover, Meadows presents evidence showing his time to file his complaints and

grievance about the May 19, 2019 incidents were extended by the ODRC Chief Inspector's

office.  (*See* Emails between Ms. Smith and the Chief Inspector, Doc. 68, Madeleine Smith Aff.

Ex. B & C, at PAGEID 1081-89).  In an email on July 29, 2019, the Chief Inspector states he has

"taken steps to ensure [Meadows] has access to the informal complaints" and that Meadows has

the ability to "voice concerns" about "staff actions on May 19, 2019.  (*Id.* at 1081).  The Chief

Inspector also acknowledged receipt of Meadows' grievance in an email to Ms. Smith on August

21, 2019, and stated, "Normally, we reject direct grievances when not on the proper form

(Notification of Grievance).  I will make an exception in this case and it will be processed."

(Doc. 68, Madeleine Smith Aff., at PAGEID 1088; *see also* Disposition of Grievance, Doc. 57-1

at PAGEID 426 (noting that the time for Meadows to file a grievance was extended)).  Further,

Meadows' allegations regarding the May 19, 2019 incident were reviewed on their merits and a

Disposition of Grievance was issued denying his grievance.  (Doc. 57-1 at PAGEID 426-27).

Where prison officials choose to address a prisoner's grievance on the merits despite an apparent

lack of exhaustion, the Court will not second guess the "decision to overlook or forgive its own

procedural bar. . . ."  *Morgan v. Trierweiler*, 67 F.4th 362, 371 (6th Cir. 2023) (quoting *Reed-Bey

v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010)).  *See also Mattox v. Edelman*, 851 F.3d 583,

591 (6th Cir. 2017) ("[P]rison officials waive any procedural irregularities in a grievance when

they nonetheless address the grievance on the merits.")).  Defendants have not addressed this

issue in their briefs.  Therefore, any alleged timeliness issues with Meadows' filing ICRs were waived and do not bar his claims for lack of exhaustion.

Defendants also argue Meadows did not exhaust his available administrative remedies because he failed to specifically identify defendants by name, except for defendant "Copley," or describe their individual actions in accordance with Ohio Admin. Code § 5120-9-31(J).  (Doc. 62 at PAGEID 1033).  However, prison staff did not reject Meadows' ICRs or grievance for his failure to name specific individuals or describe their physical descriptions and actions.  Instead, the merits of Meadows' excessive use of force complaints were reviewed, the use of force was found to be justified, and the grievance was denied.  (Doc. 57-1, Ex. H).  Under these circumstances, defendants are not entitled to summary judgment based on Meadows' alleged failure to exhaust the prison grievance procedure.  *See Morgan*, 67 F.4th at 371 (state prison officials waived any failure of inmate to name specific individuals in grievance arising from inmates claims where officials responded to grievance on the merits).

Meadows has raised a genuine issues of fact regarding whether the prison grievance system was unavailable to him, whether he made affirmative efforts to comply with the grievance procedure, and whether he was given an exception to allow him to file his complaints after the fourteen-day deadline in accordance with Ohio statute.  Defendants have failed to "satisf[y] their burden regarding the exhaustion defense" and failed to "establish the absence of a 'genuine dispute as to any material fact' regarding non-exhaustion."  *Surles*, 678 F.3d at 456 (quoting *Risher,* 2 F.3d at 240).  Therefore, defendants' motion for summary judgment based on plaintiff's alleged failure to exhaust his excessive force, failure to intervene, and supervisory liability claims should be **DENIED**.

*Non-Exhaustion of Retaliation Claim*

Defendants argue Meadows failed to exhaust his remedies related to his retaliation claim against defendant Plowman because he made no attempts "whatsoever to grieve or complain about Officer Plowman's alleged scheme to retaliate against him" and therefore failed "to exhaust his remedies . . . regarding this claim."  (Doc. 62 at PAGEID 1015).  Defendants further state that "Meadows never specifically named Officer Plowman in any grievance form he submitted" (Doc. 71 at PAGEID 1164), but the evidence in the record directly contradicts defendants' statement.  The ICR submitted by Meadows on July 31, 2019 specifically addresses the incident report filed by defendant Plowman on that date (Doc. 67, Meadows Aff. Ex. C, at PAGEID 1062), and the ICR dated August 22, 2019 directly accuses defendant Plowman, by name, of filing a conduct report in retaliation for plaintiff accessing the grievance procedure and seeking redress for his excessive force claims.  (Doc. 67, Meadows Aff. Ex. C, at PAGEID 1063).

Plaintiff's July 31, 2019 ICR presents a genuine dispute of material fact as to whether he failed to exhaust his available administrative remedies on his retaliation claim against defendant Plowman as it was dated the same day as the alleged retaliation.  Defendants do not make any arguments or present any evidence regarding Meadows' exhaustion of steps two and three of the grievance process in relation to his retaliation claim.  Defendants have not met their burden on the affirmative defense of non-exhaustion for plaintiff's retaliation claims.  Therefore, summary judgment on that claim should be **DENIED.**

**b.  Eighth Amendment claims (first claim for relief)**

**i.  Excessive Force**

*Legal Standard*

A convicted prisoner's right to be free from the use of excessive force by prison officials is governed by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Eighth Amendment excessive force claims include both a subjective and an objective component. *Sootsman v. Johnson,* 79 F.4th 608, 615 (6th Cir. 2023). The subjective component focuses on the prison official's state of mind, while the objective component analyzes whether the pain inflicted on the prisoner was "sufficiently serious." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)).

The core question for the subjective component is whether the force used by a correctional officer "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Force believed necessary, even if that belief is unreasonable, will not violate the Eighth Amendment. *Johnson*, 79 F.4th at 616 (citing *Whitley*, 475 U.S. at 324). To determine intent, courts are to consider: "What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer take any actions designed to reduce the required amount of force?" *Id.* at 618 (citing *Hudson*, 503 U.S. at 7, and *Whitley*, 475 U.S. at 321). These questions underscore that force used "in a good-faith effort to maintain or restore discipline" does not violate a prisoner's Eighth Amendment rights. *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004)).

Objectively, the prisoner "need not prove 'extreme' or 'serious' harms" because "the

23

malicious and sadistic infliction of pain violates . . . contemporary standards [of decency] whether or not the pain leads to any significant injury." *Johnson*, 79 F.4th at 616 (quoting *Hudson*, 503 U.S. at 9).  While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred." *Cordell*, 759 F.3d at 580-81 (citing *Wilkins*, 559 U.S. at 37).  "When prison officials maliciously and sadistically use force to cause harm . . . contemporary standards of decency always are violated . . . whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. 9).  The absence of a serious injury is nonetheless relevant as a factor that suggests whether the use of force may "plausibly have been thought necessary" in a given situation.  *Id.* (quoting *Hudson*, 503 U.S. at 7).  "Although the Eighth Amendment can reach minor injuries caused by significant force . . . [it] does not apply to 'de minimis uses of physical force' so long as this force does not repulse 'the conscience of mankind.'" *Johnson,* 79 F.4th at 616 (quoting *Hudson*, 503 U.S. at 9-10).

*Objective Element*

Defendants argue first that Meadows fails to establish the objective element of his excessive use of force claims because his injuries were "de minimis at best," characterizing them as "two lacerations" that "only required 'butterfly strips'" and "healed within two weeks" of the incident.  (Doc. 62 at PAGEID 1019-20).

Meadows avers he suffered a concussion and "experienced severe head pain for many days, received multiple facial lacerations that bled profusely, and experienced intense burning

24

and choking sensations for an extended period of time as a result of the repeated OC spray

blasts." (Doc. 67, Meadows Aff., at PAGEID 1050). Meadows testified that his head injury

resulted in blurred vision, "fuzziness" from being knocked in the head, and "seeing things" that

were not there. (Doc. 57 at PAGEID 312, 316, 319, 360). He also avers his "fingers were

injured while Defendant Coppick intentionally bent and twisted them," and he "sustained long-

term damage to [his] knee, the pain from which still limits my ability to participate in sports and

other physical activity to this day." (Doc. 67, Meadows Aff., at PAGEID 1050; Doc. 57 at

PAGEID 319-21). Meadows further states he suffered severe mental injury due to the force used

against him and ongoing fear of it reoccurring (Doc. 67, Meadows Aff., at PAGEID 1050),

including an increase in his existing anxiety and paranoia. (Doc. 70 at PAGEID 1110; *see* Doc.

57 at 316-321, 330 (describing his reluctance to shower more than once a month due to his

paranoia), 370 (describing not wanting to leave his cell to go to "chow hall"), 379-81 (claiming

an increase in his existing paranoia and anxiousness since the accident)). Prison medical staff

also documented that Meadows "could not see" even after being decontaminated from the OC

spray exposure and staff had to "[take] hold of his left arm" to guide him (Doc. 59-1 at PAGEID

813), and Meadows described other related pain (Doc. 57 at PAGEID 315 ("the mace was

burning me up"); Doc. 67, Meadows Aff., at PAGEID 1050 ("intense burning and choking

sensations for an extended period of time")).

There is a genuine issue of fact on the objective element of Meadows' excessive force

claims. The Sixth Circuit's decision in *Cordell v. McKinney*, 759 F.3d 573 (6th Cir. 2014), is

instructive. In *Cordell*, the plaintiff inmate sustained a "laceration deep and open enough to

leave blood on the wall, on the floor, and down [the inmate]'s face," although prison medical

staff described the wound as "so small it was hard to tell if it was a laceration or just an abrasion." *Cordell*, 759 F.3d at 586. The inmate was transported to the hospital where he received five sutures and a diagnosis of a neck-sprain. *Id.* at 586. The *Cordell* plaintiff also felt "very, very groggy," which the court found could possibly be indicative of "further head trauma." *Id.* The Sixth Circuit held the objective element of the Eighth Amendment claim was satisfied because "a jury would not be unreasonable in finding that these injuries indicate that Cordell suffered serious pain" and because the plaintiff alleged "debilitating injuries" that were not contradicted by video or medical evidence. *Id.* at 586-87.

Similar to the plaintiff in *Cordell*, Meadows has presented evidence to show a genuine dispute of material fact as to the objective element of his claim. The video shows that Meadows sustained a head injury sufficient to leave blood on the wall, on the floor, and down his face. He also presented evidence he experienced sufficiently serious pain from the head injury, burning and choking from OC spray, pain to his bent fingers and right knee, and severe mental injury. Like the inmate in *Cordell*, plaintiff's complaints of "blurry vision," "fuzziness," and visual hallucinations could be indicative of further head trauma. In contrast, defendants assert Meadows' injuries were "de minimis at best." A reasonable jury could determine that Meadows suffered severe pain such that the objective element of his Eighth Amendment claim is met.

*Subjective Element*

On the subjective element of his excessive force claims, Meadows "must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018)). Meadows must

produce "evidence from which a jury could conclude that it was more likely than not that a defendant was involved." *Id.* It is not sufficient to show "only that a defendant was 'one of' several others who might have committed the unconstitutional act." *Id*. at 492 (citation omitted).

In their motion for summary judgment, defendants argue that Meadows' claims "fail[] to establish a genuine issue of material fact as to the subjective element of the excessive force standard" as to whether defendants engaged in "malicious and sadistic conduct" because they "used the least amount of force necessary" to maintain their control over Meadows when he "was acting aggressive and being non-compliant." (Doc. 62 at PAGEID 1017). Citing to the video surveillance footage of the incident and deposition statements, defendants specifically allege that Meadows: (1) was uncooperative during his escort by planting his feet and pushing back against defendants Coppick and Plowman (Doc. 62 at PAGEID 1010), (2) threatened to spit on defendants (Doc. 62 at PAGEID 1010), (3) intentionally spit on defendants (Doc. 62 at PAGEID 1010, 1019), and (4) struggled with defendants (Doc. 62 at PAGEID 1019).

In Meadows' responsive memorandum, he denies "acting aggressively" at any time during the incident (Doc. 70 at PAGEID 1114) and testified that he was cooperating with his escort. (Doc. 57 at PAGEID 307). While Meadows admits he turned toward defendant Coppick during his escort, he claims he did so to speak to defendant Coppick about the fact that defendant Coppick was "hurting" him by "twisting his finger." (Doc. 57 at PAGEID 310). Meadows denies intentionally spitting on anyone during the incident. (Doc. 57 at PAGEID 380; Doc. 67, Meadows Aff., at PAGEID 1051: ¶ 6).

As an initial matter defendants argue the force they used was justified by Meadows "aggressive behavior," and the video of the incident "clearly" demonstrates his resistance and

27

refusal to follow orders.  (Doc. 62 at PAGEID 1007, 1010, 1018-19).  The Court finds the video

evidence is not so "clear."  There is no audio available for the incidents, so the only evidence of

any orders issued (or not) by correctional officers comes from the opposing statements of the

correctional officers themselves and Meadows.  Nor does the video clearly show that Meadows

spat at corrections officers.  Therefore, the Court must additionally examine the other evidence

presented to discern the nature of any threat justifying the use of force; whether the amount of

force used was proportional to the threat; and whether the defendants took action to reduce the

amount of force necessary.  *Johnson*, 79 F.4th at 618.  For the reasons that follow, the Court

finds that plaintiff has presented sufficient evidence to demonstrate a genuine issue of material

fact as to the subjective element of an Eighth Amendment excessive force claim against

defendants Coppick and Bauer but not against Plowman, Kinner, and Boyd.

*Defendant Coppick's Use of Force in the Sallyport*

Defendants argue that Coppick's use of force was prompted by Meadows' disobedience

of direct orders to face forward and his aggression in "planting his feet" and "turning his head

towards Officer Coppick" while being escorted to the segregation block in "J Corridor."  (Doc.

62 at PAGEID 1009, 1018; Doc. 60 at PAGEID 948).  Defendants assert that when Meadows

turned toward defendant Coppick just before they reached the gate to enter "J Corridor,"

Meadows spat on him.  (Doc. 62 at PAGEID 1005, 1010; Doc. 59 at PAGEID 730-31).  Coppick

reported that Meadows "turned completely around and spit in [Coppick's] face."  (Doc. 59-1 at

PAGEID 782; Doc. 59 at PAGEID 740).  Coppick testified that he "was trying to take

[Meadows] to the ground to prevent him from spitting on me further" (Doc. 50 at PAGEID 730),

and in the process of the take down, Meadows coincidentally struck his head on the wall causing

28

two lacerations to his forehead.  (Doc. 62 at PAGEID 1010).  Defendants argue that "[a]ny contact by Mr. Meadows's forehead with a wall or floor was purely incidental and due to [Meadows's] own aggressive behavior."  (Doc. 71 at PAGEID 1155).  Defendant Coppick does not dispute that Meadows' head hit the wall[12], but he denies it was intentional.  (Doc. 59 at PAGEID 731, 736).[13]

During the sallyport portion of the incident, Meadows' "arms were cuffed behind his back" and defendant Coppick had Meadows in an "escort position" while they walked down the hallway.  (Doc. 59-1 at PAGEID 782).  Meadows claims that when defendant Coppick was "out of view of surveillance cameras . . . [he] began to painfully twist and bend [Meadows'] fingers and hands."  (Doc. 70 at PAGEID 1107; *see* Doc. 67, Meadows Aff., at PAGEID 1050 PM).  Meadows admits he turned his head and spoke to defendant Coppick during the escort, but this was in reaction to the pain caused by Coppick's "twisting" his finger and hands, which were handcuffed.  (Doc. 57 at PAGEID 309-10).  Meadows denies intentionally spitting on any correctional officer that day.  (Doc. 70 at PAGEID 1126 (citing Doc. 67, Meadows Aff., at PAGEID 1051, ¶ 6)).

The surveillance video confirms that Meadows turned his head and shoulders back toward defendant Coppick's direction, but whether Meadows spits on Coppick cannot be

---

[12] In the use of force documentation for the incident, defendant Coppick failed to include information that Meadows' head contacted the concrete wall (or floor) in his use of force report dated the day of the incident (Doc. 59-1 at PAGEID 799) or in his statement to the use of force investigator, Bryan Sparks (Doc. 59-1 at PAGEID 782), despite admitting that the bleeding lacerations on Meadows' head resulted from his use of force.  (Doc. 59 at PAGEID 730).  Whether this omission was intentional or not cannot be determined on summary judgment.

[13] Defendants contend that defendant Coppick "had prior knowledge of Mr. Meadows' assaults on prison staff and other incarcerated individuals."  (Doc. 62 at PAGEID 1018, citing Doc. 59 at PAGEID 726-728).  Defendant Coppick's testimony on this matter is not so clear.  While he knew of one specific incident between Meadows and a fellow inmate, Coppick speculated he "would imagine [Meadows has] got a record, I don't know specifics, though."  (Doc. 59 at PAGEID 728).

discerned from the video. (Video 4:22:23 – 4:22:27). While Meadows' admission that he turned toward defendant Coppick during his escort creates a "plausible basis" for using some force, *Cordell*, 759 F.3d at 582, there is an issue of fact on Coppick's intent or motivation for the force he used that follows. The video shows Coppick spins Meadows in a full circle, then directs Meadows' head toward the concrete wall where it makes contact with the wall. Coppick then takes Meadows to the ground. (Video 4:22:24 – 4:22:31). Blood splatters can be seen on the floor where Meadows' head lay (Video 4:22:47), suggesting Meadows' head hit the wall with a sufficient amount of force to break the skin and cause bleeding to his face.

Given the conflicting evidence presented by the parties, there is a genuine issue of fact as to whether the force used by defendant Coppick on Meadows was in a good-faith effort to restore control over Meadows or was applied maliciously and sadistically with the intent to cause harm. *See Cordell*, 759 F.3d at 581. Contrary to defendants' argument, the evidence in this case is not so one-sided that no reasonable jury could find in favor of Meadows. Defendants contend that defendant Coppick's use of force was justified and appropriate because Meadows failed to comply with direct orders to face forward, he attempted to subvert the escort by planting his feet and pushing his torso backwards towards Coppick, and he spit in Coppick's face, necessitating a use of force to gain control over Meadows. Meadows' evidence indicates that Coppick, out of the view of the surveillance cameras, began to painfully twist and bend Meadows' fingers and hands without justification, which caused Meadows to turn to speak to Coppick. Meadows denies he spit at Coppick, and the video shows that once at the sallyport gate at J-E entrance, Coppick spun Meadows around, forced his head into a concrete wall, and took him to the ground. To credit defendant Coppick's version of events over those of Meadows would require

30

the Court to weigh the evidence and assess the credibility of Meadows and Coppick's statements, which the Court is not permitted to do on summary judgment. *See Anderson*, 477 U.S. at 249. Meadows has presented sufficient evidence to create an issue of fact for resolution by the jury at trial. While a reasonable jury could ultimately credit defendants' evidence and find that the force used by defendant Coppick was reasonable under the circumstances, a jury could also credit Meadows' evidence and determine that defendant Coppick's use of force was without justification and the type and amount of force used was unnecessary. *See Hudson*, 503 U.S. at 7. The evidence is not so one-sided such that a fair minded jury could not return a verdict for Meadows on his Eighth Amendment excessive force claim against defendant Coppick. Considering the conflicting evidence of the reasons for defendant Coppick's use of force, the type and amount of force use, and the extent of the injury inflicted, *see Whitley*, 475 U.S. at 320-22, there are disputed issues of material fact such that defendant Coppick's motion for summary judgment should be denied.

### *Use of Force by Defendants Coppick, Plowman, Boyd, and Kinner in J Corridor*

The next excessive use of force asserted by Meadows occurred in "J Corridor." After Meadows was taken to the ground by defendant Coppick, the sallyport gate was opened to J Corridor and defendants Plowman, Smith, Boyd, and Kinner arrived to assist Coppick. Meadows was placed in leg irons and lifted to his feet. Officers Coppick and Plowman escorted Meadows through the sallyport gate. Meadows can be seen leaning back into the officers during the escort. Plowman and Coppick maneuver Meadows against the corridor wall. On the video Meadows is seen planting his feet and throwing his torso back, pushing against the officers and struggling with them. A smear of blood is visible on the wall where Meadows' head made

contact with it.  Defendant Plowman testified that Meadows made threats to spit on Officer

Coppick (Doc. 60 at PAGEID 950, p. 46), and he observed "fluids come from Meadows's face

and hit Coppick" but he did not "know if it was spit, blood, what it was. . . .  I can't contest to

what fluids it was that I see flying."  (*Id.*, p. 47).  Defendant Plowman further testified the

officers used a maneuver to take Meadows to the ground in an effort to gain better control over

him.  (*Id.*, p. 48).  Both defendant Plowman and defendant Bauer, who had now arrived on the

scene, testified that Meadows was given orders to comply and to not spit, and Plowman heard

Meadows making "hawking sounds" like he was getting ready to spit.  (*Id.* at PAGEID 952; Doc.

58 at PAGEID 467-68).  The video shows defendant Coppick taking Meadows to the floor, and

the momentum of his maneuver caused defendant Plowman to fall to the ground on top of

Meadows.  The video shows defendant Kinner arrives and kneels near Meadows' head.  Kinner

reported to the use of force investigator that he used an "escort technique" by placing his right

knee on the back of Meadows head to control his head movement, while Coppick, Plowman, and

Boyd surrounded Meadows' body while he lay on the floor.  (Video 4:23:14 – 4:23:24; Doc. 59-

1 at PAGEID 785, 848).  Defendants state in their use of force reports that Meadows was

threatening to spit on them, did spit on them, and kicked them.  (*See* Use of Force Report, Doc.

58-1, Bauer Depo. Ex. I, at PAGEID 577-99).[14]

---

[14] Defendants point to alleged  inconsistencies in statements made by Meadows about spitting on staff, including statements he allegedly made to medical staff immediately following the incident where defendants claim he admitted to spitting.  (Doc. 71 at PAGEID 1148).  Meadows claims he was suffering from a concussion that left him "dazed" when speaking to medical staff, and when questioned directly about those statements during his deposition, Meadows could not recall making them.  (Doc. 57 at PAGEID 360-62).  However, when pressed by defendants' counsel, Meadows stated it was "possible" that he made the statements.  (Doc. 57 at PAGEID 361).
Defendants also point to statements Meadows allegedly made days after the event indicating he spit blood on corrections officers.  In a written inmate use of force statement, Meadows allegedly stated, "I would like it to be known that I was assaulted for no reason and then I was told I would be killed after I spit blood on them.  I don't know all their names but the Lt. was Bauer was one."  (See Use of Force Investigation, Doc. 58-1, Bauer Depo., at PAGEID 614).  This statement, when read in the context of Meadows deposition testimony, does not indicate an admission by Meadows.  Meadows testified defendant Bauer told him "he's going to kill me because I spit blood on him.  That was his exact words."  (Doc. 57 at PAGEID 314).  The statements in the use of force investigation could

In contrast, Meadows denies he ever intentionally spat on any of the officers, and the surveillance video is inconclusive in this regard.  He argues that the video footage showing him leaning back can be explained by being dazed after his head was slammed into a concrete wall by defendant Coppick and being forcibly thrust forward by defendants Plowman and Coppick, who were physically larger than Meadows.  Meadows further avers that once he was taken to the floor in J Corridor, his head was "bashed into the concrete floor" (Doc. 67 at ¶ 9) by "[d]efendant Coppick" who "used his left arm to surreptitiously slam Mr. Meadows's head—which was raised a few inches from the ground—once more into the concrete floor."  (Doc. 70 at PAGEID 1108, citing Video 4:23:24).

The video evidence shows that Meadows actively struggled with defendants Coppick and Plowman while standing at the wall by turning his head, thrusting his left leg back, and angling back into the officers.  The video shows Coppick used a maneuver to take Meadows to the ground, and the momentum of the movement caused defendant Plowman to fall on top of Meadows.  Contrary to Meadows' argument, the video does not show a "four-man pile-on" by defendants on Meadows (Doc. 70 at PAGEID 1108) or that defendant Kinner "joined the assault."  (*Id.*).  The undisputed video evidence shows that the force used to take Meadows to the ground was reasonable, in response to Meadows's movements at the wall, and "applied in a good faith effort to maintain or restore discipline" and not "maliciously or sadistically" to cause harm. *Whitley*, 475 U.S. at 320.  *See Williams v. Bowman*, 981 F.2d 901, 905 (6th Cir. 1992) (holding, "in the prison context, good faith use of physical force may be necessary to maintain prison security and discipline[.]").

___

be reasonably interpreted as Meadows repeating the threat allegedly made by defendant Bauer instead of an admission that he in fact spit on officers.

Once Meadows was on the ground, he was restrained by the officers. The video does not show any actions or movement by defendants Plowman, Kinner, or Boyd that could reasonably be construed as an excessive use of force, and Meadows has not introduced evidence that would call into question the force used by defendants Plowman, Kinner, or Boyd to secure his person. Because Meadows has failed to submit evidence creating a genuine issue of fact as to whether the force used by defendants Plowman, Kinner, and Boyd was reasonable under the circumstances, the motion for summary judgment should be granted on Meadows' excessive use of force claim against defendants Plowman, Kinner, and Boyd.

In contrast to defendants Plowman, Kinner, and Boyd, issues of fact preclude summary judgment for defendant Coppick. Meadows introduces evidence that his head was slammed to the ground (Doc. 67 at ¶ 9), and defendant Coppick used his left arm to "surreptitiously" slam Meadows' head into the concrete floor one time. (Doc. 70 at PAGEID 1108, citing Video 4:23:24 and rapid movement of Coppick's left shoulder). While the video is not clear, it does show some movement by Coppick that could be construed as forcing Meadows' head into the floor. A photo of Meadows' head taken immediately after the incident shows his face covered in blood (Doc. 67, Meadows Aff. Ex. A, at PAGEID 1056), supporting an inference that the force used was significant enough to cause profuse bleeding. Meadows' evidence of Coppick's use of force while Meadows was on the ground is not "blatantly contradicted" by the videorecording. *Scott*, 550 U.S. at 380. The motion for summary judgment on Meadows' excessive use of force claim against defendant Coppick should be denied.

*Use of Force by Defendant Bauer in the Strip Cell*

Once Meadows was lifted from the floor after the second takedown, he was placed in a J2 strip cell. Meadows claims defendant Bauer used excessive force against him when he sprayed Meadows twice in the face with OC spray after Meadows was secured in the strip cell. (Doc. 70 at PAGEID 1108-09). It is undisputed that defendant Bauer deployed OC spray to Meadows' face two times during the May 19, 2019 incident, while Meadows was handcuffed, shackled in leg irons, and secured in the strip cell.

The Sixth Circuit has found that "'the use of . . . chemical agents against recalcitrant prisoners' d[oes] not violate the Eighth Amendment." *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (collecting cases)). *See also Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (summary judgment granted where videotape squarely demonstrates that inmate disobeyed repeated direct orders prior to the use of pepper spray); *Thomas v. Greene*, 201 F.3d 441 (6th Cir. 1999) (Table) (soaking an inmate's back side with mace was objectively reasonable where inmate "was threatening and uncooperative throughout the [use of force] incident[.]"); *Siggers v. Renner*, No. 01-4067, 2002 WL 847986, at *1 (6th Cir. 2002) (summary judgment was properly granted in favor of corrections officers who used pepper spray on inmate because they reasonably perceived inmate's refusal to leave a strip cage as a threat to prison security). "Deploying a short burst of pepper spray in response to an inmate who is disruptive, aggressive, and spitting at corrections officers is not disproportionate to the need to control an unruly inmate and does not satisfy the subjective component of an Eighth Amendment claim." *McDougald v. Bear*, No. 1:17-cv-124, 2019 WL 652501, at *6 (S.D. Ohio Feb. 15, 2019) (report and recommendation), *adopted*, 2019 WL 4126394 (S.D. Ohio Aug. 30, 2019).

35

On the other hand, "macing an unresisting, handcuffed prisoner without provocation, and

not in response to any plausible disciplinary exigency, is an unreasonable use of force. . . ."

*Druhot v. Smith*, No. 2:22-cv-00543, 2024 WL 1049838, at *11 (S.D. Ohio Mar. 11, 2024)

(citing *Batson v. Hoover*, 355 F. Supp. 3d 604, 614 (E.D. Mich. 2018) (collecting cases), *aff'd*,

788 F. App'x 1017 (6th Cir. 2019)).  Where a correction officer's use of OC spray is unnecessary

and not applied in a good-faith effort to maintain or restore discipline but rather to cause harm,

the subjective component of an Eighth Amendment excessive force claim is satisfied.  *See*

*Hudson*, 503 U.S. at 7; *Williams*, 631 F.3d at 384 (inmate stated a valid excessive force claim

when he "allege[d] that, when instructed to 'pack up,' he inquired, 'What for, sir?,' at which

point an 'assault team' entered the cell and used a chemical agent on him."); *Roberson*, 770 F.3d

at 406-07 (denying summary judgment stage to corrections officers who sprayed sleeping

prisoner with a chemical agent, without prior warning, when prisoner was covered from head to

toe by his blanket).

Defendants argue that once inside the strip cell, Meadows spit on defendant Bauer and

disobeyed his order to face the wall.  (Doc. 58, Bauer Depo., at PAGEID 472 (citing Video

4:24:09- 4:24:14)).  Defendant Bauer testified he was standing approximately five feet away

from the strip cell when Meadows turned towards him and spat, hitting Bauer's left cheek.  (Doc.

58, Bauer Depo., at PAGEID 472).

Meadows testified he never threatened to spit on any of the defendants, and he denied

spitting saliva or blood at any of the corrections officers.  (Doc. 57 at PAGEID 314; Doc. 67 at

PAGEID 1051: ¶ 6).  Meadows admitted his blood could have gotten on one or more of the

defendants because he had blood in his mouth and eyes.  (Doc. 57 at PAGEID 314).  Meadows

36

states that when he was first placed in the strip cell, he "turned around and began talking to Defendant Bauer" who "immediately blasted [him] with OC spray." (Doc. 59 at PAGEID 1051, ¶ 10).

Here, the surveillance video shows defendant Coppick and another officer place Meadows inside of the strip cell face first and close the door. (Video 4:24:09). As an unidentified officer appears to begin securing the cell door, Meadows can be seen facing forward and standing near the cell door. (Video 4:24:09). The video shows that once the cell door is closed, defendant Bauer immediately deploys a burst of OC spray at Meadows' face for approximately two seconds. The video evidence does not establish that Meadows spat on Bauer, and the immediacy with which Bauer deployed the OC spray – upon the closing of the cell door – raises a question as to the necessity of this use of force. While all defendants report to the use of force investigator that Meadows in fact spit at defendant Bauer[15], Meadows' affidavit and testimony indicate he did not spit at Baur. In addition, the video calls into question the ability of Coppick, Plowman, Smith, and Kinner to observe Meadows' actions as the video shows their backs are turned away from the doorway to the strip cell. (Video 4:24:06 – 4:24:09). While the Court must "rely mainly on undisputed video footage," it should "adopt the plaintiff's version of any facts not caught on film." *Ashford v. Raby*, 951 F.3d 798, 800 (6th Cir. 2020). Given

---

[15] In statements made by defendants to the use of force investigator, all claimed that Meadows spit on defendant Bauer, and they observed defendant Bauer react by deploying OC spray. (See Plowman Interview, Doc. 59-1 at PAGEID 787 ("Lt. Bauer reacted [to Meadows spitting on him] and deployed oc on inmate Meadows['] facial area."); Boyd Interview, Doc. 59-1 at PAGEID 781 ("[Meadows] turned and spin on Lt. Bauer. He then reacted by deploying OC to the facial area of inmate Meadows."); Kinner Interview, Doc. 59-1 at PAGEID 785 ("I observed Lt. Bauer spray OC outside the door of J2. I was standing to the right side of Lt. Bauer."); Smith Interview, Doc. 59-1 at PAGEID 871 (Lt. Bauer deployed OC spray into the facial region of inmate Meadows), PAGEID 784)). Defendant Coppick reported that he was present for defendant Bauer's first deployment of OC spray and that Meadows spit blood that was coming from his head wound onto defendants Coppick and Bauer. (Doc. 59-1 at PAGEID 782).

Meadows' evidence, there are genuine issues of fact on whether Meadows spat at or threatened to spit on defendant Bauer, and whether Meadows failed to comply with orders to face the wall.

Bauer's second deployment of OC spray occurred four minutes later. The video shows that while Meadows is secured in the strip cell, shackled, and handcuffed, Bauer returns to the strip cell and delivers another burst of OC spray to Meadows' face. Defendants assert that when defendant Bauer returned to the strip cell, Meadows was not following orders to face the wall and threatened to spit on defendant Bauer. (Doc. 62 at PAGEID 1011-12). Defendant Bauer testified that Meadows started saying he was going to spit at him again, and "as soon as [Meadows] turned to even make the motion that he was going to do it, I sprayed him, so he didn't do it." (Doc. 58, Bauer Dep., at PAGEID 498). In other words, according to defendants, Bauer "dispersed a short burst of O.C. spray to obtain Meadows's compliance with orders." (Doc. 62 at PAGEID 1106, 1112; Video 4:28:10).

Meadows denies threatening to spit on or spitting at defendant Bauer. Meadows testified that when Bauer returned for the second time, Bauer ordered Meadows to turn around, and when Meadows complied with this order, Bauer sprayed him with OC spray. (Doc. 57 at PAGEID 314). Meadows further testified that during the second deployment of OC spray, defendant Bauer told Meadows he was going to kill him because Meadows "spit blood on him." (*Id.*).

There are genuine issues of material fact that preclude summary judgment for defendant Bauer on the excessive use of force claim involving the second deployment of OC spray. There is an issue of fact as to whether Meadows spit at or threatened to spit at defendant Bauer. Likewise, there is a dispute of fact as to whether Meadows failed to remain facing the wall on Bauer's return to the strip cell, or whether Meadows was ordered by Bauer to turn around. As

the video evidence is not conclusive on this score, the Court must view the evidence in the light most favorable to Meadows.  If Meadows' evidence is credited, Bauer's order to Meadows to turn around and alleged threat to kill him suggests that the second burst of OC spray was not done in an effort to gain control over Meadows, but was done to cause unnecessary harm. *Johnson*, 79 F.4th at 618.  In addition, even if Meadows spat at Bauer, it is a jury question whether deploying OC spray at an inmate who is handcuffed and shackled and secured in a strip cell is a use of force that is proportional to the perceived threat posed by a spitting inmate.  *Id*.

Therefore, defendants' summary judgment motion should be denied on Meadows' excessive force claim against defendant Bauer.

### ii.  Failure to Intervene

Meadows seeks to hold each defendant liable for failing to intervene in the excessive use of force by the other defendants.  As this Court has previously noted, "a correctional officer who observes an unlawful beating may . . . be held liable under § 1983 without actively participating in the unlawful beating."  *Meadows v. Coppick*, No. 1:21-cv-322, 2022 WL 14752283, at *5 (S.D. Ohio Oct. 25, 2022) (Cole, J.) (quoting *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990)).  The Sixth Circuit has applied a two-part test in failure to intervene claims: (1) "[a]n officer must have 'observed' the force 'or had reason to know' a colleague would use it"; and (2) "the officer must have 'had both the opportunity and the means' to stop it."  *Chaney-Snell v. Young,* 98 F.4th 699, 722 (6th Cir. 2024) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  *See also Meadows*, 2022 WL 14752283, at *5 (citing *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013); *Partin v. Parris*, No. 17-6172, 2018 WL 1631663, at *2-3 (6th Cir. Mar. 20,

2018); *Briggs v. Miles*, No. 15-1386, 2017 WL 2174252, at *3-4 (6th Cir. Mar. 6, 2017)).[16] The second element requires a showing that "the primary wrongdoer used the force for a 'long enough' time that the observing officer had a realistic chance to end it." *Id.* (quoting *Pelton v. Perdue*, 731 F. App'x 418, 426 (6th Cir. 2018)). "[A]n officer without forewarning generally will not have the ability to stop a colleague's force if the force continues for 'ten seconds or less[.]'" *Chaney-Snell*, 98 F.4th at 722 (and cases cited therein).

In this case, the video evidence shows each of the instances of use of force lasted for mere seconds, and does not support a finding of liability on any of the defendants. Defendant Coppick's first use of force—resulting in Meadows' head hitting the concrete wall—lasted approximately three seconds. Defendant Smith is seen entering the view of the camera when Coppick is already in the process of spinning Meadows around before striking his head on the wall, and none of the other defendants are seen on the video. Meadows has presented no evidence raising a jury question as to whether any of the defendants had the means or opportunity to stop Coppick's use of force.

The second use of force alleged by Meadows concerns Coppick's actions after the second takedown. Meadows avers his head was "bashed into the concrete floor" after he was taken down by Coppick and secured by the other defendants. (Doc. 67 at ¶ 9). Meadows asserts Coppick "surreptitiously" slammed Meadows' head into the concrete floor, and he cites to the "rapid movement" of Coppick's left shoulder on the video to support this claim. (Doc. 70 at

---

[16] The Court acknowledges that *Chaney-Snell*, *Burgess*, and *Turner* addressed failure to intervene claims by non-convicted arrestees as opposed to convicted prison inmates. Nevertheless, the Sixth Circuit has incorporated the two-step analysis used in those cases into the Eighth Amendment failure to intervene context. *See, e.g., Partin v. Parris*, No. 17-6172, 2018 WL 1631663, at *2-3 (6th Cir. Mar. 20, 2018); *Briggs v. Miles*, No. 15-1386, 2017 WL 2174252, at *3-4 (6th Cir. Mar. 6, 2017).

40

PAGEID, citing Video 4:23:24).  This alleged use of force lasted approximately two seconds.

Again, Meadows has presented no evidence any other defendants could have known about or

stop the "surreptitious" blow to Meadows' head by Coppick.

The next use of force claimed by Meadows was by defendant Bauer.  In his memorandum

in opposition to the motion for summary judgment, Meadows states he "does not contend that his

failure-to-intervene claim covers any Defendant's failure to stop Defendant Bauer from hosing

Mr. Meadows with OC spray."  (Doc. 70 at PAGEID 1130 n.15).  Therefore, defendants' motion

for summary judgment should be granted for defendants Coppick, Plowman, Boyd, Kinner, and

Smith on Meadows' failure to intervene claim as to Bauer's use of OC spray.[17]

### c. Supervisory liability against defendant Bauer (second claim for relief)

In Meadows' second claim for relief, Meadows brings a claim for supervisory liability

against defendant Bauer.  (Doc. 17 at PAGEID 82).  Meadows specifically alleges that

"Defendant Bauer stood by while subordinate [d]efendant [o]fficers beat [Meadows]," that he

"directly committed, participated in, encouraged, facilitated, approved [of] condoned, turned a

blind eye to, knowingly acquiesced . . . [etc.]" the unconstitutional conduct of the other

Defendants, and further that Defendant Bauer failed to supervise his subordinates in following

law, regulations, and procedure related to use of force.  (Doc. 24, quoting Doc. 17 at ¶ 34, 66-

74).

---

[17] In any event, Meadows has not presented evidence created an issue of fact as to this claim.  Once
Meadows was placed in the strip cell and the door was closed, less than 2 seconds later Bauer deployed OC spray at
Meadows.  Defendant Bauer deployed OC spray almost immediately and without warning such that the other
defendants had neither the time nor opportunity to intervene.  Likewise, Bauer's second use of OC spray on
Meadows occurred approximately four minutes after the first.  The video shows that when Bauer returned to the
strip cell, the two corrections officers who are present are not defendants, who had already left the strip cell area to
decontaminate.

As previously explained by this Court, "a supervisor has a duty to intervene to stop unjustified violence by his or her subordinates occurring in the supervisor's presence, and failing to do so would be an abdication of his or her supervisory role." *Meadows*, 2022 WL 14752283, at \*7 (citing *Crawford v. Tilley*, 15 F.4th 752, 761-62 (6th Cir. 2021)).  To be liable under § 1983, defendant Bauer must have "'authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of his subordinates through the execution of his job functions.'" *Id*. (quoting *Crawford*, 15 F.4th at 761 (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016)).  As the Court explained in connection with its ruling on defendants' motion for judgment on the pleadings:

> Applying that standard on the alleged facts here, the same inaction that gives rise to a plausible failure to intervene claim also supports a supervisory liability claim. Indeed, if Meadows proves Bauer's presence while the beatings occurred, the "supervisory liability" claim would essentially be a form of duty to intervene claim. That is, a supervisor has a duty to intervene to stop unjustified violence by his or her subordinates occurring in the supervisor's presence, and failing to do so would be an abdication of his or her supervisory role. *See Crawford*, 15 F.4th at 761-62.

*Id*. at \*7.

As explained above, Meadows has failed to present evidence creating a genuine issue of fact that defendant Bauer failed to intervene in any excessive use of force by his subordinates. Defendant Bauer was not present for the first instance of force used by defendant Coppick in the sallyport.  Regarding the second alleged use of force by Coppick, Meadows was already on the ground and being restrained by defendants Coppick, Plowman, Boyd, and Kinner when defendant Bauer arrived in J Corridor.  The only issue of fact on any use of excessive force in connection with this incident involves defendant Coppick's alleged bashing of Meadows' head into the ground when Meadows was being restrained by the other defendants.  According to

Meadows, Coppick "surreptitiously" bashed Meadows' head on the ground, and Coppick's use of force is depicted on the video at 4:23:24 p.m.  (Doc. 70 at PAGEID 1131).  At that time, however, the video shows Bauer passing the threshold of the sallyport gate, and he does not join the group until three seconds later, after the Coppick's alleged use of force had already concluded.  (Video 4:23:27).  Viewing the facts in the light depicted by the videotape, *Scott*, 550 U.S. at 381, Bauer was not in a position to view Coppick's alleged use of force at the time Meadows alleges it occurred, and Meadows does not present any other evidence creating a genuine issue of fact on this claim.  Meadows has failed to present evidence creating a genuine issue of fact on his supervisory liability claim against defendant Bauer.  Defendants' motion for summary judgment should be granted for defendant Bauer on this claim.

### d.  First Amendment retaliation (third claim for relief)

Meadows' third claim for relief asserts a First Amendment retaliation claim against defendant Plowman.  Meadows states defendant Plowman retaliated against Meadows for filing a complaint related to the May 19, 2019, incidents by fabricating a conduct report alleging Meadows threatened to kill a correctional officer.  (Doc. 17 at PAGEID 84; Doc. 67, Meadows Aff., at PAGEID 1053).  As a result of the conduct report, Meadows states he was sentenced to two years in restricted housing with limited privileges.  (Doc. 70 at PAGEID 1112, 1132).  Meadows further avers he was denied parole on the basis of the August 5, 2019 report by defendant Plowman and the May 19, 2019 events.  (Doc. 70 at PAGEID 1112, citing Doc. 67, Meadows Aff., at PAGEID 1050).

To establish a First Amendment retaliation claim, a plaintiff must demonstrate: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that

would deter a person of ordinary firmness from continuing to engage in that conduct; and (3)

there is a causal connection between elements one and two—that is, the adverse action was

motivated at least in part by the plaintiff's protected conduct. *Maben v. Thelen,* 887 F.3d 252,

264 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

"[R]etaliatory motive is difficult to prove through direct evidence" and "is often shown by

circumstantial evidence." *Meadows*, 2022 WL 14752283, at *8 (citing *Harbin-Bey v. Rutter*,

420 F.3d 571, 580 (6th Cir. 2005); *Maben*, 887 F.3d at 267). Generally, causation involves "a

factual issue to be resolved by a jury." *Maben*, 887 F.3d at 267 (quoting *Harris v. Bornhorst*,

513 F.3d 503, 519-20 (6th Cir. 2008)). "Nonetheless, a court may grant summary judgment even

in a causation inquiry, where it is warranted." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996)

(citation omitted).

Defendants do not dispute that Meadows engaged in a protected activity by filing a

complaint. Rather, they argue that Meadows does not establish the second element of an

actionable retaliation claim because, even if defendant Plowman had filed an "erroneous or even

fabricated" conduct report, it would still not be sufficient to constitute an adverse action. (Doc.

62 at PAGEID 1027).

Whether the issuance of a misconduct ticket rises to the level of an adverse action

depends on the punishment associated with being found guilty of the misconduct. *Maben*, 887

F.3d at 266 (citing *Scott v. Churchill*, 377 F.3d 565, 572 (6th Cir. 2004) ("[T]he mere potential

threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation.");

*Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) (looking to what the prisoner "could have

been sentenced to . . . if he had been found guilty")). Issuing a misconduct ticket that carries the

possibility of more restrictive confinement, expulsion from group activities, or loss of privileges constitutes an adverse action. *Maben*, 887 F.3d at 267-68 (collecting cases). Meadows was found guilty of the misconduct ticket and sentenced to two years of segregated housing. (Doc. 57, Meadows Dep., at PAGEID 329). As this Court previously found, "if Plowman indeed fabricated a Conduct Report in which he claimed that Meadows threatened to kill a corrections officer, that strikes the Court as the type of adverse action that would deter a similar inmate." *Meadows*, 2022 WL 14752283, at *10. Defendant Plowman is not entitled to summary judgment based on the second element of Meadows' retaliation claim.

Next, defendants argue that Meadows fails to demonstrate a causal connection between the first and second elements of his retaliation claim. Defendants contend Meadows' claim fails because (1) defendant Plowman was not aware that Meadows was one of the individuals he allegedly overheard plotting to kill a female correction officer until he "looked at the block roster," (2) defendant Plowman had "no knowledge" that Meadows had made attempts to complain about the May 19, 2019 incidents because defendant Plowman was not named in any submitted grievance forms, (3) defendant Plowman issued the conduct report against Meadows "one day prior" to the "lone ICR" addressing the May 19, 2019 incident (Doc. 62 at PAGEID 1029), (4) defendant Plowman ultimately was not the decision maker of whether Meadows was moved to segregation (Doc. 71 at PAGEID 1164), and (5) Meadows can produce no evidence to support that defendant Plowman's report was fabricated (Doc. 71 at PAGEID 1164).

Meadows argues there is circumstantial evidence that defendant Plowman's conduct was motivated by Meadows' decision to report the May 19, 2019 assaults. He avers that he never made statements about wishing to kill a female prison guard to get on death row. (Doc. 67 at ¶

45

20). Meadows cites the temporal proximity between the May 2019 incidents and Plowman's issuance of the conduct report a little over two months later in support of the causal connection. (*See* Doc. 70 at PAGEID 1134 (citing *Meadows*, 2022 WL 14752283, at *10)). He also points to proximity of the August 5, 2019 conduct report—issued five days after Plowman allegedly heard the threats by Meadows—and five days after Meadows filed the July 31, 2019 ICR. (Doc. 70 at PAGEID 1134). Meadows also argues that Plowman was both the "retaliating officer and one of Mr. Meadows's assailants on May 19." (Doc. 70 at PAGEID 1135). Meadows asserts that the very nature of the conduct report written by defendant Plowman—alleging he plotted with another inmate to murder a female correctional officer for purposes of being transferred death row—is highly unlikely given his impending parole hearing and budding romantic relationship with Ms. Smith. (Doc. 70 at PAGEID 1135-36 (citing to defendant Plowman's deposition statements that even he could not think of a plausible reason for an inmate to want to be moved to death row); Doc. 67, Meadows Aff., at PAGEID 1062). Meadows argues that the "extreme and implausible nature of the allegations" would be likely to produce a "swift and stern response" (Doc. 70 at PAGEID 1135 (citing *Meadows*, 2022 WL 14752283, at *10), lending credence to his assertions that the conduct report was fabricated. Meadows also contends the "circumstances under which [d]efendant Plowman allegedly overheard Meadows discussing [the murder plot]" are implausible because Meadows would have been able to see defendant Plowman from the vantage point of his cell and would have been aware that the conversation could be overheard. (Doc. 70 at 1136-37, citing Doc. 60 at PAGEID 957-961).

Meadows has presented evidence creating an issue of fact on the causation element and defendant Plowman's motivation for filing the conduct report. The conduct report was filed two

46

months after the May 19 incidents, which is far less than the six-month window supporting a

finding of causation.  *Meadows*, 2022 WL 14752283, at *8 (citing *Kirschke v. Chance*, No. 19-

2324, 2020 WL 6703843, at *3 (6th Cir. July 21, 2020); *Nguyen v. City of Cleveland*, 229 F.3d

559, 566-67 (6th Cir. 2000)).  Meadows has denied ever making a threat to kill a prison guard or

a desire to be on death row, and testified that the allegation was "absurd."  (Doc. 67 at ¶ 20; Doc.

57 at PAGEID 326).  Defendants characterize Meadows' denial as "self-serving."  (Doc. 71 at

PAGEID 1163).  "Although perhaps not as strong as some other evidence might be, self-serving

statements can create a genuine dispute of material fact to be resolved at trial."  *Davis v.*

*Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020).  There is no evidence in the record to show

Meadows' denial is "demonstrably false or totally implausible."  *Id.*[18]  In addition, Meadows has

presented evidence aside from his "self-serving" denials indicating he lacked any motive to be

placed on death row because of the relationship he had with his now-spouse and his impending

parole hearing.  While Plowman denies knowledge of Meadows' complaints and grievances

about the May 19 incidents, Meadows' evidence indicates he filed ICRs about the May 19

"excessive force" incidents prior to the date Plowman issued his conduct report, but his ICRs

were "lost" by prison officials, which could support an inference that prison officials, including

Plowman, were aware of Meadows' attempts to access the grievance process.  Additionally,

"Plowman's (allegedly fabricated) claim—that Meadows conspired to kill a staff member—is

---

[18] The Sixth Circuit has held that "[a] finding of guilt at a prison misconduct hearing does not act as an absolute bar to a prisoner's First Amendment retaliation claim."  *Maben*, 887 F.3d at 262.  Where a prisoner submits evidence creating an issue of fact on causation, the burden of production shifts to prison officials to show they would have taken the same action regardless of the protected conduct.  *Id.*  Defendant Plowman does not address this burden shifting in the motion for summary judgment or present evidence to support his burden.

sufficiently extreme to support the notion that Plowman had a retaliatory motive." *Meadows*, 2022 WL 14752283, at *10.

Finally, defendants argue that defendant Plowman was not the "decision maker in escalating Meadows' security level" and therefore, Meadows "cannot establish the causal connection for a retaliation claim." (Doc. 71 at PAGEID 1164). "[P]rotected speech causes an adverse action if the speech motivates an individual actor to take acts that then proximately cause an adverse action." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). In other words, "a person who sets in motion an adverse action can be liable for retaliation for the reasonably foreseeable consequences of his actions." *Id.* While defendant Plowman was not the ultimate "decision maker" regarding Meadows' transfer to restrictive housing, the extreme nature of the allegedly false conduct report—threats to kill a female correctional officer—implies that a transfer to restrictive housing was a "reasonably foreseeable consequences of his actions." *Id.*

The Court finds Meadows has presented sufficient evidence creating a genuine issue of fact regarding the causal connection between his complaints about the May 19, 2019 incidents and defendant Plowman's conduct report. Accordingly, the Court recommends that defendants' motion for summary judgment on the First Amendment retaliation claim against defendant Plowman be denied.

### e. Qualified Immunity

Defendants are not entitled to qualified immunity on Meadows' Eighth Amendment excessive use of force claim against defendants Coppick and Bauer or his First Amendment retaliation claim against defendant Plowman.

Qualified immunity "shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982)). Qualified immunity not only insulates government officials from individual liability for money damages, but also from the burdens and expenses of litigation and trial. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). Once a defendant raises a qualified immunity defense to a claimed constitutional violation, the plaintiff must satisfy a two-pronged analysis: (1) Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the official's conduct violated a constitutional right, and (2) if a violation could be made out on a favorable view of plaintiff's submissions, was the right clearly established at the time of the injury. *Id*. at 201. In its discretion, the court may initially address either of these questions in light of the circumstances of the particular case before it when resolving an official's qualified immunity claim. *Pearson,* 555 U.S. 223.

When the defendants raise the qualified immunity defense, the plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citing *Reilly v. Vadlamudi,* 680 F.3d 617, 623 (6th Cir. 2012)). The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." *Saucier*, 533 U.S. at 201. Showing that a right is clearly established "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Middaugh v. City of Three Rivers*, 684

F.3d 522, 529 (6th Cir. 2017) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Clearly-established law for qualified immunity purposes must be defined specifically and not "at a high level of generality." *Id.* (citing *Mullenix*, 577 U.S. 7) (quoting *Ashcroft*, 563 U.S. at 742). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. 7 (quoting *Ashcroft*, 563 U.S. at 742) (emphasis added by *Mullenix*).

As explained above, the Court finds that genuine issues of material fact preclude summary judgment on Meadows' Eighth Amendment excessive force claims against defendants Coppick and Bauer and on his retaliation claim against defendant Plowman. The Court therefore considers the second prong of the qualified immunity analysis, i.e., whether Meadows' Eighth and First Amendment rights were clearly established at the relevant time.

"[I]f there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable [corrections] official would have known such conduct was wrongful." *Cordell*, 759 F.3d at 588 (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 642 (6th Cir. 2001)). Accordingly, defendant Coppick is not entitled to qualified immunity on Meadows' excessive force claims at this juncture.

Likewise, "it [is] clearly established that the unprovoked use of pepper spray on a prisoner who is not causing any disturbance, with no disciplinary justification, and merely in response to a question posed to a guard, is a constitutional violation." *Batson v. Hoover*, 355 F. Supp. 3d 604, 615 (E.D. Mich. 2018) (citing *Roberson*, 770 F.3d at 407), *aff'd*, 788 F. App'x

50

1017 (6th Cir. 2019). As there are issues of fact on whether Meadows disobeyed orders to face the wall and spit or threatened to spit at defendant Bauer on the two occasions Bauer deployed OC spray at Meadows, Bauer is not entitled to qualified immunity.

Lastly, the Sixth Circuit has repeatedly recognized that if a correctional officer "retaliated against [a prisoner] for filing grievances," the "alleged conduct also comprises a violation of clearly established constitutional law." *Maben*, 887 F.3d at 269 (quoting *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996) (citations omitted); *Zamiara,* 150 F. App'x at 493 ("Charging an inmate with misconduct is an adverse action because serious consequences can flow from erroneous charges."); *Scott*, 377 F.3d at 572 (finding it clearly established that "the false issuance of a misconduct charge is unconstitutional retaliation"); *Bell*, 308 F.3d at 612)). Therefore, defendant Plowman is not entitled to qualified immunity on Meadows' First Amendment retaliation claim because there are genuine issues of fact as to whether Plowman issued a false conduct report in retaliation for Meadows' grievances and complaints concerning the May 19, 2019 incidents.

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' motion for summary judgment (Doc. 62) be **DENIED** on Meadows' Eighth Amendment excessive use of force claims against defendants Coppick and Bauer and First Amendment retaliation claim against defendant Plowman.

2. Defendants' motion for summary judgment (Doc. 62) be **GRANTED** in all other respects.

Date: 11/20/2024

Karen L. Litkovitz
Chief United States Magistrate Judge

51

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

TOMMY MEADOWS,                                   Case No. 1:21-cv-322
      Plaintiff,                                  Hopkins, J.
                                                 Litkovitz, M.J.

     vs.

CORRECTIONAL OFFICER
C. COPPICK, et al.,
      Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation within **FOURTEEN (14) DAYS** after being served with a copy thereof.  This period may be extended further by the Court on timely motion by either side for an extension of time.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).