**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **Tommy Meadows,** | : | **Case No. 1:21-cv-322** |
| | : | |
| **Plaintiff,** | : | **Judge Jeffery P. Hopkins** |
| | : | |
| **v.** | : | |
| | : | **Magistrate Judge Litkovitz** |
| **Correctional Officer C. Coppick, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANTS, CHRISTOPHER COPPICK, KENNETH PLOWMAN, AND WILLIAM BAUER'S MOTION FOR JUDGMENT AS A MATTER OF LAW, PURSUANT TO FED. R. CIV. P. 50(b)**

NOW COME Defendants, Christopher Coppick, Kenneth Plowman, and William Bauer ("Defendants"), by and through counsel, and hereby move the Court, pursuant to Fed. R. Civ. P. 50(b), for judgment as a matter of law. Alternatively, if the Court does not grant Defendants' Judgment as a Matter of Law, Defendants move the Court, pursuant to Fed. R. Civ. P. 59(a), for a new trial on all of Plaintiff's claims.

The grounds for this motion are fully described in the memorandum in support set forth below.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ D. Chadd McKitrick*
**D. CHADD MCKITRICK (0073750)**
**SALVATORE MESSINA (0097510)**
Assistant Attorneys General
Criminal Justice Section
Corrections Litigation Unit
30 E. Broad Street, 23rd Floor
Columbus, Ohio 43215
(614) 644-7233/FX: (866) 359-3383
Daniel.McKitrick@OhioAGO.gov
Salvatore.Messina@OhioAGO.gov
*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

II. STATEMENTS OF FACTS ADMITTED AT TRIAL ..... 2

A. Practices and Protocol at SOCF ..... 2

1. Mass Movement Practices ..... 2
2. Disciplinary Practices ..... 3

B. May 19, 2019 Events ..... 4

1. Mr. Coppick's Conduct ..... 4
2. Mr. Bauer's Conduct ..... 7
3. Plaintiff's Physical Injuries ..... 9

C. July 31, 2019 Conduct Report ..... 11

III. LAW AND ARGUMENT ..... 12

A. Rule 50(b) Standard ..... 12

B. The evidence admitted at trial, when viewed in a light most favorable to Plaintiff, does not establish an Eighth Amendment Excessive Use of Force Claim against Mr. Bauer. ..... 13

1. Objective Component ..... 13
2. The Subjective Component ..... 15
3. Mr. Bauer is entitled to qualified immunity ..... 17

C. The evidence admitted at trial, when viewed in a light most favorable to Plaintiff, does not establish a First Amendment Retaliation Claim against Mr. Plowman ..... 22

D. The evidence admitted at trial, when viewed in a light most favorable to Plaintiff, does not establish an Eighth Amendment Excessive Use Of Force Claim against Mr. Coppick. ..... 26

1. Subjective Component ....................26
2. Objective Component ....................29
3. Mr. Coppick is entitled to qualified immunity....................29

E. In the alternative, the Court should grant Defendants a new trial under Fed. R. Civ. P. 59 ....................31

IV. CONCLUSION ....................33

CERTIFICATE OF SERVICE ....................34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allsopp v. Foust*,
No. 23-5203, 2024 U.S. App. LEXIS 13189 (6th Cir. May 31, 2024) .......... 32

*Annabel v. Washington*,
No. 24-1425, 2024 U.S. App. LEXIS 24976, 2024 WL 4766187 (6th Cir. Oct. 2, 2024) .......... 25

*Brown v. Perez*,
No. 16-2558, 2017 U.S. App. LEXIS 14959 (6th Cir. Apr. 17, 2017) .......... 20

*Bullocks v. Hale*,
No. 1:18-cv-288, 2019 U.S. Dist. LEXIS 86674 (S.D. Ohio May 23, 2019) .......... 13, 14

*Burnett v. Griffith*,
33 F.4th 907 (6th Cir. 2022) .......... *passim*

*Coleman v. Bowerman*,
474 F. App'x 435 (6th Cir. 2012) .......... 23

*Cordell v. McKinney*,
759 F.3d 573 (6th Cir. 2014) .......... 13, 30, 31

*Davis v. Agosto*,
89 Fed. Appx. 523 (6th Cir. 2004) .......... 20

*Dixon v. Neubacher*,
No. 1:12 CV 1213, 2015 U.S. Dist. LEXIS 41686, 2015 WL 1476776 (N.D. Ohio Mar. 31, 2015) .......... 14

*Evans v. Prof'l Transp., Inc.*,
614 Fed. Appx. 297 (6th Cir. 2015) .......... 25, 26

*Goudlock v. Blankenship*,
No. 1:13-cv-1215, 2016 U.S. Dist. LEXIS 89484 (N.D. Ohio July 11, 2016) .......... 14

*Griffin v. Hardrick*,
604 F.3d 949 (6th Cir. 2010) .......... 31

*Harrison v. Gregg*,
No. 1:12-CV-005, 2013 U.S. Dist. LEXIS 136779, 2013 WL 5353188 (S.D. Ohio Sept. 24, 2013) .......... 14

*Holzemer v. City of Memphis*,
621 F.3d 512 (6th Cir. 2010) .......... 23

*Hudson v. McMillian*,
503 U.S. 1, 112 S. Ct. 995 (1992) .......... 13, 16

*Hunter v. Ervin*,
No. 1:19-cv-204, 2020 U.S. Dist. LEXIS 95564 (S.D. Ohio May 31, 2020) .......... 16

*Johnson v. Sootsman*,
79 F.4th 608, 621 (6th Cir. 2023) .......... 29

*Jones v. Clark Cnty.*,
959 F.3d 748, 766 (6th Cir. 2020) .......... 18

*King v. Zamiara*,
680 F.3d 686 (6th Cir. 2012) .......... 22, 24

*Leonard v. Hoover*,
76 Fed. Appx. 55 (Sept. 17, 2003) .......... 20

*McDougald v. Clagg*,
2021 U.S. Dist. LEXIS 191631 (S.D. Ohio Oct. 5, 2021) .......... 16

*McDougald v. Clagg*,
No. 1:18-cv-93, 2020 U.S. Dist. LEXIS 88913, 2020 WL 2557039 (S.D. Ohio May 20, 2020) .......... 16

*McNair v. Pratt*,
No. 24-1362, 2025 U.S. App. LEXIS 23014, 2025 WL 2529819 (6th Cir. Sept. 3, 2025) .......... 18, 19

*Miller v. Tyler Par.*,
2023 U.S. Dist. LEXIS 123976, 2023 WL 4594757 (S.D. Ohio July 18, 2023) .......... 15

*Miller v. Tyler Par.*,
No. 1:21-cv-200, 2023 U.S. Dist. LEXIS 112991, 2023 WL 4275136 (S.D. Ohio June 29, 2023) .......... 15

*Roberts v. Howard*,
No. 17-5435, 2018 U.S. App. LEXIS 1496 (6th Cir. Jan. 22, 2018) .......... 20

*Sedore v. Landfair*,
No. 2:22-cv-10060, 2025 U.S. Dist. LEXIS 76807, 2025 WL 1158849 (E.D. Mich. Mar. 26, 2025) .......... 24

*Skinner v. Bolden*,
89 Fed. Appx. 579 (6th Cir. 2004) .......... 24

*Smith v. Winkle*,
13cv784, 2014 WL 1796063 *2 (S.D. Ohio, May 6, 2014) .......... 15

*Sykes v. Anderson*,
625 F.3d 294 (6th Cir. 2010) ....................................................................................12

*Thaddeus–X v. Blatter*,
175 F.3d 378 (6th Cir. 1999) ....................................................................................23

*Thomas v. Greene*,
No. 99-3179, 1999 U.S. App. LEXIS 34054 (6th Cir. Dec. 17, 1999)...................................20

*Walker v. Michigan Dep't of Corr.*,
128 F. App'x 441 (6th Cir. 2005) ..............................................................................22

*Whitley v. Albers*,
475 U.S. 312, 106 S. Ct. 1078 (1986)........................................................................16

**Statutes, Codes, & Rules**

First Amendment ......................................................................................................22, 24

Eighth Amendment ......................................................................................................*passim*

Fed. R. Civ. P. 50 ......................................................................................................*passim*

Fed. R. Civ. P. 59 ......................................................................................................2, 31, 33

# MEMORANDUM IN SUPPORT

## I. INTRODUCTION

A jury trial in this civil action commenced September 8, 2025, and continued until September 12, 2025, when the jury entered a verdict in favor of Tommy Meadows ("Plaintiff"), as to his three claims against Defendants, Christopher Coppick, William Bauer, and Kenneth Plowman. In total, the jury awarded Plaintiff compensatory damages in the amount of $209,000 and punitive damages in the amount of $195,000.

When reviewing the evidence admitted at trial in a light most favorable to Plaintiff, there is no genuine issue of material fact for the jury, and reasonable minds can come but to only one conclusion as to the following:

- As to the excessive use of force claim against William Bauer, there was no evidence admitted at trial demonstrating that he maliciously and sadistically exerted force by disbursing O.C. spray for the purpose of inflicting pain upon Plaintiff. To the contrary, the evidence admitted at trial only demonstrated Mr. Bauer disbursed the O.C. spray in two separate, two-second spurts, the least level of force available, in a good faith effort to maintain discipline during a mass movement of inmates at a maximum-security institution. [DX-5].
- As to the retaliation claim against Kenneth Plowman, there was no evidence admitted at trial demonstrating that his issuance of a conduct report against Plaintiff for a separate incident that occurred on July 31, 2019, was causally connected to his attempts to grieve or complain about the conduct of correction officers, including Defendant Plowman, from the use of force incident on May 19, 2019. To the contrary, the evidence admitted at trial demonstrated that Kenneth Plowman

had no knowledge whatsoever of Plaintiff's attempts at filing complaints and other grievances.

- As to the excessive use of force claims against William Bauer and Christopher Coppick, there was no evidence admitted at trial demonstrating that the force was excessive or that Plaintiff suffered any actual injury above that of a *de minimis* injury.

Finally, even if the Court were to find a genuine issue of fact as to these issues, the Court should find that William Bauer and Kenneth Plowman are entitled to qualified immunity. Plaintiff has not, and cannot, demonstrate that Defendants Bauer and Plowman would have reasonably known they were violating clear statutory or constitutional rights established by the Sixth Circuit or Supreme Court.

For these reasons, more fully analyzed herein, the Court should grant Defendants judgment as a matter of law, notwithstanding the verdicts of the jury. In the alternative, the Court should grant Defendants a new trial as each of these issues raised herein, in accordance with Fed. R. Civ. P. 59.

## II. STATEMENT OF FACTS ADMITTED AT TRIAL

All of Plaintiff's claims originate from an event that took place on May 19, 2019, at the Southern Ohio Correctional Facility ("SOCF"), where Plaintiff was incarcerated. SOCF is a maximum-security institution, housing higher security risk inmates.

### A. Practices and Protocol at SOCF.

#### 1. Mass Movement Practices.

Inmates housed in general population and "transition" blocks are permitted to have meals at the institution's mess or "chow" hall. To maintain order and safety, approximately twenty (20)

inmates only will move as a group to the chow hall. When it is a designated mealtime, multiple groups of inmates will move to and from the chow hall in what is known as a "mass movement." It is important that prisoners move in an orderly fashion to ensure their safety and the safety of prison officials and correction officers. Correction officers are required to stay and maintain the area where they are posted so there can be a structured and tiered response to disturbances for inmate and staff protection and safety and so that inmates do not overtake correction officers. [Doc. 110, PageID 1872 – 1873, 1876].

**2. Disciplinary Practices.**

At SOCF, when an inmate violates an institutional rule and must be segregated from the rest of the inmate population, they are escorted to the J2 restricted housing block to be processed in the J2 "strip cell." Whenever an inmate enters any new housing block, they are processed to ensure that they are not carrying and introducing contraband into the housing block. This is done within a "strip cell." When entering any strip cell, inmates are required to first face towards the wall so that correction officers can remove restraints. The inmates are then instructed to strip their clothing and undergo an inspection of their person for contraband. [*Id.*, PageID 1877 – 1878]

The J2 block has a strip cell located at its entrance, and it is an "open bar" cell. After being inspected for contraband at the J2 strip cell, the inmate being disciplined is issued orange prison clothing and escorted to their restricted housing cell in either the J or K housing blocks. [*Id.*, PageID 1878]. Plaintiff acknowledged knowing and understanding the process and protocol of being processed in the J2 strip cell when being disciplined. [Doc. 111, PageID 2155].

### B. May 19, 2019 Events.

#### 1. Mr. Coppick's Conduct.

On May 19, 2019, Plaintiff was housed in an Extended Restrictive Housing Transition ("ERHT" or "ET") Unit. [*Id.*, PageID 2171]. Plaintiff acknowledged he may have drank "hooch," a homemade alcohol on May 19, 2019. He claimed he was not "drunk" though. [*Id.*, PageID 2170 – 2171]. When the group of inmates within Plaintiff's ERHT Unit was moving to the "chow hall" for a meal, a fight broke out between incarcerated individuals in the K corridor. Plaintiff admitted to participating in the initiation of the fight by "jawing" at other inmates. [Doc. 111, PageID 2145]. Instead of just walking away from the fight, Plaintiff acknowledged pulling and pushing away a participant in the physical part of the fight. [*Id.*, Page 2147]. Plaintiff, in direct disobedience of orders, walked towards the physical altercation to assist an inmate who was fighting as opposed to stepping away as directed. In walking towards the altercation, Plaintiff slipped on O.C. spray that had been disbursed to break up the fight and became entangled with a correction officer. Subsequently, correction officers who responded to the fight instructed Plaintiff to cuff up to be escorted to the J2 restricted housing block per the practice and protocol described herein. [*Id.*, PageID 2147 – 2151].

The initial correction officer who began escorting Plaintiff transferred him to then-Correction Officer Christopher Coppick ("Mr. Coppick") for the remainder of the escort to the J2 segregation block. Plaintiff and Mr. Coppick provided different narratives concerning Mr. Coppick's escort of and use of force against Plaintiff in their testimony:

According to Plaintiff, Mr. Coppick began manipulating his hands and fingers during the escort and when they approached the gate to enter the J corridor, and then Mr. Coppick threw Plaintiff headfirst into the adjacent wall unprovoked. Plaintiff testified that Mr. Coppick then threw

him to the ground. Plaintiff further testified that when another correction officer, Mr. Plowman, arrived and the gate to the J corridor opened, Defendants Coppick and Plowman picked him off of the ground, somehow lifted him in the air, and subsequently pushed him against the wall adjacent to the door into the J2 housing block. Plaintiff testified that at this point he was thrown onto the ground, where additional correction officers piled onto him. According to Plaintiff, Mr. Coppick continued pushing his head into the floor, while Mr. Plowman purportedly manipulated his leg. [Doc. 110, PageID 2048 – 2052].

According to Mr. Coppick, when he first arrived Plaintiff was cuffed up and handed off to Coppick so other officers could continue to deal with the situation. Coppick did not see what initially occurred, but was called to escort Plaintiff to J2, restrictive housing. As he attempted the escort Plaintiff was uncooperative and refused to obey orders from Officer Coppick to face forward. Plaintiff was pushing back, turning, spitting on the ground and planting his feet to prevent the escort from taking place. [Doc. 110, PageID 1925]. Mr. Coppick further testified that once he and Plaintiff reached the gate to the J corridor, where the door doesn't open and there is nowhere to go, Plaintiff turned and spat on Officer Coppick. Both men acknowledged struggling with each other. To regain control of Plaintiff, Officer Coppick moved to place Plaintiff on the floor and due to the continual resistance and disobeying of orders of Plaintiff and the confined space, Plaintiff's head struck the wall. Coppick was able to testify to the situation as a whole, not in the freeze frame portions Plaintiff attempted to isolate. Coppick correctly conveyed that this was an ongoing escort with ongoing resistance by Plaintiff. [*Id.*, PageID 1926 – 1931 and 1958 - 1959].

Coppick testified that Mr. Plowman arrived to assist and once Plaintiff finally calmed down while on the floor, the two assisted him up from the ground; however, as they started escorting him again, Plaintiff again became non-compliant with the escort. [*Id.*, PageID 1960]. Because the

door to the J2 housing block was not yet open, the two put Plaintiff against the adjacent wall, where Plaintiff continued to resist, turn and push back against them. Believing they were losing control over Plaintiff and for officer safety, Mr. Coppick testified he placed Plaintiff on the ground to obtain better control over him and to prevent him from further spitting and resisting. [*Id.*, PageID 1960 – 1962]. While Plaintiff would have preferred Mr. Coppick not to react to the Plaintiff spitting at him and resisting, Mr. Coppick chose to follow protocols and control the situation. [*Id.*, PageID 1937]. The video evidence demonstrated Plaintiff's continued belligerence, turning physically resisting and spitting; thus, other correction officers were deployed to assist Defendants Coppick and Plowman to regain control of Plaintiff. This is where a divergence of material facts related to Mr. Coppick's interaction with Plaintiff ends.

Here are the undisputed facts relating to Mr. Coppick's interaction with Plaintiff. At the time Mr. Coppick and Plaintiff reached the gate to enter the J corridor, Plaintiff admitted to "talking shit to him." [Doc. 110, PageID 2050]. Plaintiff acknowledged "jawing" with Mr. Coppick during the escort. [*Id.*, PageID 2048]. Plaintiff further acknowledged turning his head towards Mr. Coppick. [*Id.*, PageID 2152]. Both men are clearly observed struggling against each other in the video. [DX-5 at 4:22:24]. Furthermore, when Plaintiff is being subdued against the wall adjacent to the J2 housing block by Defendants Coppick and Plowman, Plaintiff is turning towards Mr. Coppick and further has his leg kicked out turned towards officers. [*Id.*, PageID 2153 – 2154]. Plaintiff testified he was discombobulated and only had a vague memory of what occurred and other parts he could not remember. [*Id.*, PageID 2151]. Plaintiff acknowledged someone else other than Coppick had control over his head when other officers were assisting Defendants Coppick and Plowman to control Plaintiff. [Doc. 111, PageID 2154].

**2. Mr. Bauer's Conduct.**

The video evidence showed that while on the floor, Plaintiff and the correction officers struggled. [DX-5 at 4:23:17]. It was at this time that William Bauer, a Lieutenant and supervisor at the time, arrived at the scene. Mr. Bauer, along with other supervising officers, including Lieutenant Broughton, had been attempting to restore order after the fight because there was a mass movement of inmates going to and from the chow hall. [Doc. 110, PageID 1890]. Mr. Bauer testified that during this mass movement to and from the chow hall, there were a limited number of correction officers who were outnumbered by the number of inmates. [Doc. 110, PageID 1871]. Upon hearing the struggle involving Plaintiff in the J corridor, Mr. Bauer responded to where correction officers were attempting to subdue Plaintiff. Mr. Bauer testified that he was carrying O.C. spray at the ready due to the danger this situation presented with a mass movement of inmates and a fight having already broken out. Mr. Bauer had not observed and did not know what previously occurred between Plaintiff and Mr. Coppick. [Doc. 110, PageID 1890 – 1891].

Once arriving in the J corridor, Mr. Bauer testified he saw Plaintiff and other correction officers struggling on the floor. Plaintiff was not obeying verbal directives, physically struggling with correction officers and making verbal threats. After Plaintiff was finally subdued and was lifted from the ground, Plaintiff again escalated his behavior as correction officers escorted him to the J2 strip cell. [*Id.*, PageID 1891 – 1892]. It is clear from surveillance video and Plaintiff's own acknowledgement that he was directing his attention towards Mr. Bauer upon being lifted and escorted to the J2 strip cell. Once he was in the strip cell, Plaintiff admitted he did not follow directives and protocol to face towards the wall. Instead, Plaintiff continued his disobedience of direct orders and directed his attention towards Mr. Bauer where Mr. Bauer testified that Plaintiff unequivocally spat at him. [Doc. 111, PageID 2155].

Plaintiff even agreed and testified that spit and blood could have left his person. [*Id.*, PageID 2214]. In cross-examination, Plaintiff acknowledged stating to Lt. Broughton afterwards, "Tell Bauer that wasn't directed at him." Plaintiff further acknowledged at trial signing a statement that said, "I did spit blood." [*Id.*, PageID 2160].

Mr. Bauer testified that he reasonably believed at that time Plaintiff spat at him, and Plaintiff corroborated this. [Doc. 109, PageID 1815]. As a result, Mr. Bauer disbursed a short burst of O.C. spray towards Plaintiff. Mr. Bauer testified that he engaged in this minimal use of force because (1) Plaintiff's aggressive behavior that he personally observed; (2) he believed Plaintiff spat in his direction; and (3) it was necessary to restore order so that other inmates involved in the earlier fight could be processed through the J2 strip cell and moved to restricted housing.

Afterwards, video surveillance played at trial showed Lt. Broughton checking Mr. Bauer for blood as he left the J corridor to decontaminate from exposure to the O.C. spray. [Doc. 110, PageID 1894 – 1895]. Mr. Bauer testified that when he reached a sink to decontaminate, he observed blood on his cheek and washed it off. Subsequent video surveillance showed a nurse checking Mr. Bauer's face and neck. Mr. Bauer testified the nurse was checking him to see if any blood remained on his person. None of the evidence corroborating Mr. Bauer's testimony that he had Plaintiff's blood on his cheek was contradicted in any manner at trial.

Once Mr. Bauer decontaminated himself of the O.C. spray, he returned to continue overseeing the mass movement of inmates and the processing of inmates at the J2 strip cell. Mr. Bauer testified that Plaintiff's remaining in the J2 strip cell prevented other inmates involved in the earlier fight from being processed in the J2 strip cell before being assigned to a restricted housing cell. [*Id.*, PageID 1897].

When Mr. Bauer returned to the J2 strip cell, he testified he inquired of Plaintiff as to whether he had calmed down and was ready to be compliant with orders. Mr. Bauer testified that although Plaintiff was facing the wall, he began escalating his voice, made a vulgar comment to Mr. Bauer, and then turned his head towards Mr. Bauer. Mr. Bauer testified that due to his prior observation of Plaintiff's behavior and already having been spat at, he believed Mr. Meadows was going to spit in his direction again. As a result, Mr. Bauer gave a second short disbursement of the O.C. spray to quickly de-escalate the situation and prevent Plaintiff from again spitting at him. [Doc. 109, PageID 1821 – 1824].

During this time, Lt. Broughton and others continued overseeing the mass movement of inmates to and from the chow hall. Other inmates involved in the earlier fight are seen complying with their escort and standing near the J2 block in order to be processed through the J2 strip cell for assignment to a restricted housing cell. None of these inmates are observed acting in the belligerent and disobedient manner of Plaintiff. Because of Plaintiff's defiant actions, he could not be safely processed in the J2 strip cell, so other inmates had to be escorted to other areas of the J block that are not normally used for processing inmates to be assigned to a restricted housing cell.

**3. Plaintiff's Physical Injuries.**

The evidence admitted at trial established Plaintiff incurred three small lacerations to his head during his struggle with officers. While the lacerations bled at first, the bleeding stopped by the time Plaintiff was escorted from the J2 strip cell to be observed by medical personnel in the institution's infirmary. The evidence showed that the cuts were no larger than the width of a finger and only required "butterfly" strips for closure. [Doc. 110, PageID 2061]. Although Plaintiff stated that scars later developed as a result of the lacerations, Plaintiff failed to provide evidence of scars or that the alleged scars affected him negatively in any other manner. [*Id.*]. There was no evidence

the alleged scars caused any additional subsequent pain to Plaintiff or that he lost employment or the affection of others due to the scars.

Plaintiff testified to being discombobulated after his head struck the wall. [*Id.*, PageID 2057]. Plaintiff further testified that he suffered a leg injury due to someone else falling on his leg. [*Id.*, PageID 2062]. However, this testimony is belied by other evidence admitted at trial.

Handheld video clearly demonstrated Plaintiff was not affected by his head striking the wall. In fact, Plaintiff conceded he was able to understand and follow instructions from Lt. Broughton and other medical personnel. In the video, Plaintiff can be seen joking with Lt. Broughton and medical personnel. Plaintiff clearly understood the medical treatment proposed by medical personnel and consented to being treated and even thanked the medical personnel for giving him medical treatment. At one point, nurses inquired whether Plaintiff had any communicable diseases that he should report and elaborated that it was because Plaintiff had spit blood at correction officers. At no time did Plaintiff contest or deny to medical personnel that he spat blood at correction officers. [Doc. 111, PageID 2163 – 2165 and DX-4].

Plaintiff never complained of any head, leg, hand, or finger injury to medical personnel in the infirmary as corroborated in the handheld video. To the contrary, when questioned by medical personnel whether he had any injury other than the lacerations, Plaintiff stated, "Not at all. I'm all right. I'm all right." [DX-4 at 9:17]. Nor did Mr. Meadows present at trial any medical record or testimony demonstrating that he was treated for any head/brain, leg, hand, or finger injury thereafter.

It is uncontested that Mr. Meadows suffered some temporary discomfort and pain from being exposed to O.C. spray. However, Mr. Meadows never presented evidence at trial showing

he had any lasting physical eye, lung, or skin injury as a result of the exposure to the O.C. spray beyond May 19, 2019.

**C. July 31, 2019 Conduct Report.**

At approximately noon on July 31, 2019, Mr. Plowman reported to work at SOCF assigned to the P.M. recreation officer post. He was then re-assigned to perform a constant watch duty in the K2 Block at SOCF, where his responsibility was to observe a particular inmate to ensure that inmate did cause harm to himself. Mr. Plowman testified he was positioned on the bottom floor of K2 directly across from the inmate he was assigned to observe. He could hear the activity in the other cells around his position. [Doc. 110, PageID 2010 – 2022]. Handheld video of this same area was played at trial, where Mr. Meadows acknowledged one could easily hear other inmates conversing and yelling. [Doc. 111, PageID 2142].

During his shift, Mr. Plowman testified he heard two inmates having a conversation about getting onto to death row and killing a female corrections officer. During the conversation he did not know the names of the inmates who had the conversation. Once his shift on constant watch ended, he reported this conversation to his supervisor and was told to write an incident report. He checked which inmates were assigned to the cells he heard the conversation come from and wrote an incident detailing the conversation between Plaintiff Tommy Meadows and Inmate Williams. At trial, Plaintiff acknowledged that he and Inmate Williams were proximately located to each other at the time Mr. Plowman heard the conversation.

On August 5, 2019, Mr. Plowman reported to his supervisors, and he was instructed to convert his incident report to a conduct report. [Doc 110, PageID 2034 – 2035]. After he did this, he testified he was not involved in any subsequent investigations, hearings, or determining the penalty for Mr. Meadows. [*Id.*, PageID 2035].

Mr. Plowman's testimony that (1) he was not aware of any complaints or grievances that Plaintiff had filed against other correction officers regarding the May 19, 2019, incident or that Plaintiff was attempting to complain about the events of that day was unrefuted. [*Id.*]. There was also no other evidence admitted at trial demonstrating Mr. Plowman was aware other correction officers were threatening to harm or kill Plaintiff. There was no evidence demonstrating Mr. Plowman was aware that the Chief Inspector's Office was allowing Mr. Meadows an extension of time to utilize the inmate grievance system. [Doc. 110, PageID 2036 – 2040]. In fact, Mr. Plowman testified that he was not aware of the emails sent to the Chief Inspector by Plaintiff's fiancée.

While Plaintiff characterized testimony relating to utilization of the inmate grievance system and threats by other correction officers as circumstantial evidence, Plaintiff failed to produced evidence tying this circumstantial evidence to Mr. Plowman whatsoever. Instead, Plaintiff's evidence was pure innuendo beyond that of circumstantial evidence.

## III. LAW AND ARGUMENT

### A. Rule 50(b) Standard.

A Rule 50(b) motion for judgment as a matter of law is granted "only if viewing the evidence in a light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come but to only one conclusion, in favor of the moving party." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 614 (6th Cir. 2007) (internal quotation marks omitted)). Courts are not to "reweight the evidence or assess the credibility of witnesses," and they must only review "evidence that was admitted at trial." *Id.* (citing 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2540 (3d ed. 2008); *Tschira v. Willingham*, 135 F.3d 1077, 1088

(6th Cir. 1998)). Applying only the evidence at trial and viewing it in a light most favorable to Plaintiff, the Court should find that he did not satisfy the Eighth Amendment Use of Force standard as it applied to his claims against Defendants Bauer and Coppick.

**B. The evidence admitted at trial, when viewed in a light most favorable to Plaintiff, does not establish an Eighth Amendment Excessive Use of Force Claim against Mr. Bauer.**

An Eighth Amendment excessive force claim has both a subjective and objective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). Plaintiff's claims of excessive use of force by Defendant Bauer by deploying a short burst of OC spray upon an inmate who was actively resisting and spitting on officers fails. Here, Plaintiff failed to admit evidence at trial to support both the objective and subjective elements of his excessive force claim.

**1. Objective Component.**

The objective component requires the "pain inflicted to be 'sufficiently serious'" to offend "contemporary standards of decency." *Bullocks v. Hale*, No. 1:18-cv-288, 2019 U.S. Dist. LEXIS 86674, at *22 (S.D. Ohio May 23, 2019) *report and recommendation adopted*, 478 F. Supp. 3d 639, 642 (S.D. Ohio 2020) (*quoting Cordell*, 759 F.3d at 580 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), and *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 1000 (1992))). The Eighth Amendment "does not reach de minimis uses of physical force, provided that such use is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 7. "It is true that the extent of injury is not 'dispositive of whether an Eighth Amendment violation has occurred,' but it is also true that such evidence 'may help determine the amount of force used by the prison official.'" *Bullocks,* 2019 U.S. Dist. LEXIS 86674, at *22 *report and recommendation adopted*, 478 F. Supp. 3d at 642 (S.D. Ohio 2020) (quoting *Cordell*, 759 F.3d at 580-81). "Likewise, although it is unnecessary for an inmate to show any 'significant' injury, the extent of

the injury remains a factor to be considered in determining whether the assertion of force was objectively unreasonable." *Id.* citing *Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010).

On the record of trial before the Court, Plaintiff failed to satisfy the objective component of an Eighth Amendment excessive force claim. Where medical records in evidence show no discernable injury to a plaintiff, a defendant's actions constitute a *de minimis* use of force. *See Harrison v. Gregg*, No. 1:12-CV-005, 2013 U.S. Dist. LEXIS 136779, 2013 WL 5353188, at *8-*9 (S.D. Ohio Sept. 24, 2013) (summary judgment appropriate where inmate alleged that he sustained two black eyes, bruises, lumps and a cut failed, but submitted no evidence to establish any injuries beyond burning eyes from application of mace and small cut noted by the nurse to establish that he suffered a discernible injury resulting from the use of force alleged), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 41051, 2014 WL 1276153, at *3 (S.D. Ohio Mar. 27, ("[A]s the Magistrate Judge noted, the medical records in evidence show no discernible injury to Plaintiff, and therefore Defendants' actions constituted a *de minimis* use of force. Plaintiff has not provided any evidence which would contradict the medical records, which show that Plaintiff only suffered a small cut and complained of burning in his eyes from the mace."); c.f. *Dixon v. Neubacher*, No. 1:12 CV 1213, 2015 U.S. Dist. LEXIS 41686, 2015 WL 1476776, at *18 (N.D. Ohio Mar. 31, 2015) (distinguishing *Harrison*, 2013 U.S. Dist. LEXIS 136779, 2013 WL 5353188, at *8 on the grounds that plaintiff presented evidence of injuries). *Goudlock v. Blankenship*, No. 1:13-cv-1215, 2016 U.S. Dist. LEXIS 89484, at *15-19 (N.D. Ohio July 11, 2016) (collecting cases).

At trial, Plaintiff gave only a vague response as to how long the O.C. spray had an effect on him. Plaintiff never testified he suffered any loss of vision or any other difficulty seeing after

being exposed to the O.C. spray on May 19, 2019. Plaintiff did not testify that he suffered any other long-term negative physical effects stemming from the O.C. spray after May 19, 2019. In fact, Plaintiff never sought medical treatment for any physical issues as a result of the exposure to the O.C. spray. Nothing in the trial record supports a discernable physical injury to Plaintiff other than a *de minimis* that was temporary in nature.

This Court has consistently held that temporary discomfort due to exposure of O.C. spray, mace, or pepper spray similar to that possibly suffered by Plaintiff "simply does not rise to the level of objective repugnance necessary to support an Eighth Amendment excessive-force claim." *Miller v. Tyler Par.*, No. 1:21-cv-200, 2023 U.S. Dist. LEXIS 112991, *5, 2023 WL 4275136 (S.D. Ohio June 29, 2023) (Gentry, M.J.) R & R adopted by, *Miller v. Tyler Par.*, 2023 U.S. Dist. LEXIS 123976, 2023 WL 4594757 (S.D. Ohio July 18, 2023) (citing *Bullocks*, 2019 U.S. Dist. LEXIS 86674, 2019 WL 2233095, at *8-9 (collecting cases)).

The evidence admitted at trial, viewed in a light most favorable to Plaintiff, failed to show any discernible physical injury; thus, Plaintiff failed to satisfy the objective element of the excessive use of force standard. As such, Mr. Bauer is entitled to judgment as a matter of law on Plaintiff's excessive force claim based on the objective element alone. Nonetheless, Plaintiff further failed to satisfy the subjective element at trial as well.

**2. The subjective component.**

The subjective component of an Eighth Amendment excessive force claim considers "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Smith v. Winkle*, No. 2;13cv784, 2014 WL 1796063 *2 (S.D. Ohio, May 6, 2014) (quoting *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992))). In considering the subjective

component of an excessive force claim, a court considers the need for the use of force; the relationship between that need and the type and amount of force used; the threat reasonably perceived by the official, and the extent of the injury inflicted. *Hudson,* 503 U.S. at 7; *Whitley v. Albers,* 475 U.S. 312, 320, 106 S. Ct. 1078, 1084 (1986). "Because the use of force relates to the prison official's legitimate interest in maintaining security and order, the court must be deferential in its review of the necessity and force." *Hunter v. Ervin*, No. 1:19-cv-204, 2020 U.S. Dist. LEXIS 95564, at *9 (S.D. Ohio May 31, 2020) (citing *Whitley,* 475 U.S. at 327). The Eighth Amendment does not prohibit a *de minimis* use of force "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 10 (quoting *Whitley,* 475 U.S. at 327) (internal quotations omitted).

> This Court and others repeatedly have held that the use of pepper spray in response to an inmate who is disruptive, aggressive, and spitting at corrections officers is not disproportionate to the need to control an unruly inmate and does not satisfy the subjective component of the of an Eighth Amendment claim. *See Easley v. Little*, 2016 U.S. Dist. LEXIS 96628, 2016 WL 4006676 at *7 (S.D. Ohio 2016) ("A short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey an order."); *McDougald v. Bear* (R&R filed Feb. 15, 2019) (collecting cases); *McDougald v. Erdos*, 1:17-cv-95, 2018 U.S. Dist. LEXIS 134119 (R&R filed 8/9/2018 at 9-10 (same)); *McDougald v. Dillow*, Case No. 1:16-cv-1099, 2018 U.S. Dist. LEXIS 129498 (R&R filed 8/2/18 at 7, 10-11 (same)); *McDougald v. Eaches*, Case No. 1:16-cv-900, 2018 U.S. Dist. LEXIS 139902 (R&R filed 8/17/18 at 10 (same)).

*McDougald v. Clagg*, No. 1:18-cv-93, 2020 U.S. Dist. LEXIS 88913, *10, 2020 WL 2557039 (S.D. Ohio May 20, 2020) (Bowman, M.J.) R&R adopted by *McDougald v. Clagg*, 2021 U.S. Dist. LEXIS 191631 (S.D. Ohio Oct. 5, 2021) (Cole, J.).

It was uncontroverted at trial that when Mr. Bauer approached the J corridor, he observed an unruly and aggressive Plaintiff. Plaintiff remained aggressive as he was being lifted and escorted to the J2 strip cell. Mr. Bauer unmistakenly testified that Plaintiff spat at him, and as a reaction, Mr. Bauer gave a short disbursement of the O.C. spray.

Once he was placed in the J2 strip cell, the evidence plainly demonstrated Plaintiff did not face the wall as ordered. It was uncontested that Plaintiff was preventing correction officers from processing other inmates involved in the earlier fight through the J2 strip cell.

After cleaning Plaintiff's blood and saliva from his face, Mr. Bauer returned four minutes later to inquire whether Plaintiff was ready to comply with orders, Plaintiff again turned his head towards Mr. Bauer, and Mr. Bauer explicitly believed Plaintiff was going to spit in his direction again. Mr. Bauer testified that he gave another short disbursement of O.C. spray to again restore order so that the other inmates could be processed through the J2 strip cell for assignment to restricted housing. Plaintiff did not present any evidence to counter Mr. Bauer's unequivocal belief. Furthermore, the fact that the J2 strip cell is an open bar cell corroborates Mr. Bauer's rationale for believing Plaintiff continued to be a threat to the safety of any correction officer approaching the J2 strip cell. With Plaintiff's continuous aggressive, defiant behavior, and the fact that he had already spit blood and saliva at officers, including Defendant Bauer, a preventative disbursement of O.C. spray is not malicious or sadistic and can only be seen as used to restore order.

**3. Mr. Bauer is entitled to qualified immunity.**

In making this Rule 50(b) motion for judgment as a matter of law, Mr. Bauer revives Defendants' Rule 50(a) motion made at trial that they are entitled to qualified immunity.

"Qualified immunity shields government officials from civil-damages liability for violations of 'clearly established statutory or constitutional rights.'" *Burnett v. Griffith*, 33 F.4th 907, 911 (6th Cir. 2022) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions' and 'protects all but the plainly incompetent or those who knowingly violate

the law.'" *McNair v. Pratt*, No. 24-1362, 2025 U.S. App. LEXIS 23014, * 13, 2025 WL 2529819 (6th Cir. Sept. 3, 2025) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). When a defendant raises the defense of qualified immunity, the plaintiff then bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Id.* (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)).

The Supreme Court has articulated a two-prong test to determine whether an official is entitled to qualified immunity. "The first prong questions whether the facts, "taken in the light most favorable to the party asserting the injury, . . . show that the officer's conduct violated a constitutional right.'" *Id.* (quoting *Jones Clark County*, 959 F.3d 748, 766 (6th Cir. 2020) (internal quotation marks omitted (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). The "second prong determines 'whether the right is clearly established.'" *Id.*

Here, Mr. Bauer contends that Plaintiff is not able to meet either prong. As the evidence demonstrated, Plaintiff was acting aggressive and escalated his behavior, thereby causing Mr. Bauer to react to his aggression. At no time was Plaintiff exposed to the O.C. spray in an unprovoked manner. Thus, Plaintiff is not able to demonstrate that a constitutional violation occurred.

Nevertheless, Mr. Bauer focuses upon the second prong of the Supreme Court's test in averring he is entitled to qualified immunity.

In considering the second prong of the qualified immunity analysis, a court must "determine whether the state of the law, at the time of [the] conduct, was sufficiently clear to a "reasonable official in the defendant's shoes" that he "would have understood that he was violating [the right in question]." *Burnett*, 33 F.4th at 912 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). In looking to whether the law was clearly established, the Sixth Circuit has mandated that

one must look to "precedential Supreme Court or Sixth Circuit caselaw that clearly establishes the right." *McNair*, 2025 U.S. App. LEXIS 23014 at * 15 (citing *Coley v. Lucas County*, 799 F.3d 530, 540 (6th Cir. 2015)). The Sixth Circuit has a "general rule against using out-of-circuit caselaw in the 'clearly established' inquiry." *Burnett*, 33 F.4th at 913 (citing *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020)).

Clearly established law involves "producing a case that does more than define his rights 'high level of generality.'" *McNair*, 2025 U.S. App. LEXIS 23014 at *15 (quoting *Al-Kidd*, 563 U.S. at 742). "[T]he case must be specific enough that it would put *every* reasonable officer in 'the *particular* situation that [the defendant] . . . confronted' on notice that the officer's conduct was unlawful. *Id.* (quoting *Howse v. Hodous*, 952 F.3d 402, 407 (6th Cir. 2020)). "Merely citing a 'generic right . . . often will not give officers proper notice about what they must do in a specific situation (for example, a domestic disturbance involving a knife),' and is therefore insufficient to defeat qualified immunity.'" *Id.* (quoting *Erickson v. Gogebic County*, 133 F.4th 703, 710 (6th Cir. 2025) (citation modified)).

Keeping these principles in mind, because Mr. Bauer (and the other defendants) again raises the affirmative defense of qualified immunity, Plaintiff is required to produce to the Court (1) a Sixth Circuit or Supreme Court case that (2) existed prior to May 19, 2019, (3) with specific facts similar to those facts admitted at trial, that would have placed Mr. Bauer (and the other defendants) on notice that their behavior was unlawful. In other words, is there a Sixth Circuit or Supreme Court case journalized prior to May 19, 2019, where the court found that a correction officer in a maximum-security prison violated an inmate's constitutional right to be free from cruel and unusual punishment by disbursing O.C. (or pepper) spray upon the inmate upon seeing him be non-compliant with orders, aggressive, or spitting? The resounding answer to this question is: NO.

This matter is similar to Sixth Circuit opinions in *Roberts v. Howard*, No. 17-5435, 2018 U.S. App. LEXIS 1496 (6th Cir. Jan. 22, 2018); *Brown v. Perez*, No. 16-2558, 2017 U.S. App. LEXIS 14959 (6th Cir. Apr. 17, 2017); *Leonard v. Hoover*, 76 Fed. Appx. 55 (Sept. 17, 2003); and, *Thomas v. Greene*, No. 99-3179, 1999 U.S. App. LEXIS 34054 (6th Cir. Dec. 17, 1999), where the Sixth Circuit found in each case that use of mace to bring a recalcitrant inmate in compliance with orders was not malicious or sadistic.

In *Roberts*, 2018 U.S. App. LEXIS 1496 at 2, the Sixth Circuit found that a correction officer used mace in a good-faith effort to restore discipline when the inmate refused to remove his arm from the cuffport of a closed-door cell, despite the inmate posing no threat to the correction officer.

In *Brown*, 2017 U.S. App. LEXIS 14959, at * 5 (citations omitted), the Sixth Circuit found that use of tear gas against an inmate locked in a closed cell who was refusing to comply with orders was not malicious or sadistic in light of officer's efforts to temper the situation and the temporary nature of the inmate's injuries. In coming to this conclusion, the Sixth Circuit relied upon several past decisions it and the Supreme Court made regarding the use of chemical agents to subdue a noncompliant inmate. *See*, *Brown*, 2017 U.S. App. LEXIS 14959, at * 4 – 5 (citing *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002); *Davis v. Agosto*, 89 Fed. Appx. 523, 526 (6th Cir. 2004); *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992); *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)).

In *Leonard*, 76 Fed. Appx. at 57, the use of a chemical agent was justified when the inmate refused to comply with orders and suffered only minor injuries.

The Sixth Circuit also held in *Davis v. Agosto*, 89 Fed. Appx. at 526, that use of a chemical agent was made in a "good-faith effort to maintain or restore discipline." There, the inmate plaintiff

refused to place his hands near a tray slot so that he could be handcuffed, and the correction officer used the chemical agent to obtain compliance.

Here, the evidence demonstrates, even when viewed in a light most favorable to Plaintiff, Plaintiff was noncompliant to verbal directives, continuously actively resisting and spitting blood and saliva at officers. The video surveillance footage clearly showed Plaintiff acting aggressively requiring officers to have to lift him from the floor, where he continued his aggressive behavior while being escorted to the J2 strip cell. Plaintiff tried to make light of the fact that he was behind bars, but as far as Mr. Bauer knew, Plaintiff had spat at, or attempted to spit at, other correction officers, including himself. Being that Plaintiff failed to obey an order, and already having knowledge, to face the wall, Plaintiff remained facing correction officers, and Mr. Bauer disbursed the O.C. spray towards him.

After giving Plaintiff an opportunity to calm himself, when Mr. Bauer returned to inquire whether he was going to comply, Plaintiff turned his head towards Mr. Bauer, at which time Mr. Bauer gave a second short disbursement of O.C. spray towards Plaintiff in order to regain order. Mr. Bauer testified he did so as Plaintiff had already spat on him and was previously and continuously acting in an aggressive manner. Any reasonable official standing in Mr. Bauer's shoes would not have understood they were violating any constitutional right clearly established by the Sixth Circuit or Supreme Court. *Burnett*, 33 F.4th at 912. Due to a lack of any constitutional right clearly established prior to May 19, 2019, the Court should find Mr. Bauer is entitled to qualified immunity.

**C. The evidence admitted at trial, when viewed in a light most favorable to Plaintiff, does not establish a First Amendment Retaliation Claim against Mr. Plowman.**

The Sixth Circuit has held:

> In order to demonstrate retaliation for protected conduct, a plaintiff must allege (1) that he engaged in protected conduct, (2) that an adverse action was taken against him that would "deter a person of ordinary firmness from continuing to engage in that conduct," and (3) that the adverse action was motivated by the protected conduct.

*Walker v. Michigan Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005) (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). In this matter, there was no evidence admitted at trial to satisfy the third element of a causal connection between Plaintiff's protected conduct and the purported adverse action of Mr. Plowman. "To establish the third element of his claim, Plaintiff must show both (1) that the adverse action was proximately caused by an individual defendant's acts, but also (2) that the individual taking those acts was motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (citation and internal quotation marks omitted).

Here, Plaintiff relied upon the timing of events to show retaliation and purported threats made by other correction officers, which fails.

First, Plaintiff contends that the conduct report issued by Mr. Plowman came just three days after he was granted an extension of time by the Office of the Chief Inspector in which to utilize the grievance system to complain about the May 19, 2019, incident. Plaintiff simply contends he has established a circumstantial temporal proximity as to motive behind Mr. Plowman's actions but has presented no other evidence to further explain or corroborate Mr. Plowman's alleged motive in issuing the conduct report. The Sixth Circuit has held this is not enough evidence to establish the causal connection element.

In *Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010), the Sixth Circuit explained temporal proximity and ruled that timing alone is not enough to establish a retaliatory motive. "In theory, temporal proximity between the protected conduct and the adverse action, standing alone, may be significant enough to create an inference of retaliatory motive." *Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012) (citing *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004)). "[W]hen other evidence of retaliatory motive is lacking, [courts] have been reluctant to hold that temporal proximity is sufficient to establish causation." *Id.* If a plaintiff only has circumstantial evidence of temporal proximity and no other direct evidence of a retaliatory motive, the burden shifts to the defendant to demonstrate that they "would have taken the same action in the absence of the protected activity[.] *Thaddeus-X*, 175 F.3d at 399.

Defendant Plowman testified he heard Plaintiff and another inmate discussing how they wanted to get on death row and the only way to do so would be to kill someone, a correction officer. The two inmates agreed that killing a female correction officer would be "easier," they just needed the right time and tools to do it. Defendant Plowman testified that he reported the plot to his shift supervisor, who told him to write an incident report and turn it in, which he did. The alleged conspiratory delay was not existent per the uncontested testimony that after Defendant Plowman turned in the incident report he was off and when he returned to work when he was informed by the investigator that he should have written a conduct report. Defendant Plowman then wrote the conduct report based on the previously reported and provided incident report.

Plaintiff presented no evidence to tie Mr. Plowman to the protected conduct of utilizing the grievance system. The grievances Plaintiff submitted, or attempted to submit, were not about Mr. Plowman, directed to Mr. Plowman, or made in such a manner that Mr. Plowman would have read

or even have known about them. Thus, any evidence of a retaliatory motive is missing, even in a circumstantial context.

Ultimately, Mr. Plowman testified that he would have issued the conduct regardless of whether or not he was aware that Plaintiff was attempting to utilize the grievance system as he testified he had a duty to report threats made by inmates. [Doc. 110, PageID 2036]. There was no evidence at trial to show that Mr. Plowman in any manner knew Plaintiff was attempting to utilize the grievance system to complain about the May 19, 2019, incident. Nor was there any evidence that Mr. Plowman knew of others allegedly threatening Plaintiff or thwarting his attempts to utilize the grievance system.

It is not logically possible for one to retaliate against another when the person accused of retaliation does not even have a scintilla of knowledge about the protected conduct. *See*, *Sedore v. Landfair*, No. 2:22-cv-10060, 2025 U.S. Dist. LEXIS 76807, 2025 WL 1158849 (E.D. Mich. Mar. 26, 2025) (granting defendant's Rule 50(a) Motion for Judgment as a Matter of Law). Further, Mr. Plowman testified that he would have written the conduct report regardless of whether or not he knew that Plaintiff was filing grievances because he wrote the conduct report as it is his duty to report threats.

Plaintiff presented no evidence whatsoever to connect Mr. Plowman specifically to any "desire to punish an individual for exercise of a constitutional right." *King*, *supra*. Rather the evidence Plaintiff presented to satisfy the causal connection element of a retaliation claim at best applied to a broader number of unnamed individuals with purported conspiratorial motives against him. The Sixth Circuit has previously determined that evidence of others attempting to conspire against a plaintiff is unpersuasive in establishing a First Amendment retaliation claim. *Skinner v. Bolden*, 89 Fed. Appx. 579, 580 (6th Cir. 2004).

Moreover, while Plaintiff inferred at trial that many prison officials worked together to retaliate against him in various methods, none of the evidence ever connected this plan to Mr. Plowman in any manner. More importantly, Plaintiff failed to produce evidence suggesting "the existence of an agreement or plan between" Mr. Plowman and other prison officials to retaliate against him for utilizing the grievance system. *See*, *Annabel v. Washington*, No. 24-1425, 2024 U.S. App. LEXIS 24976, * 7, 2024 WL 4766187 (6th Cir. Oct. 2, 2024).

There are instances where Sixth Circuit has allowed knowledge of a protected activity in situations where the defendant "'took an action with respect to the plaintiff, other than the challenged adverse action, from which it could be inferred that the [defendant] was aware of the plaintiff's' protected activity." *Evans v. Prof'l Transp., Inc.*, 614 Fed. Appx. 297, 300 (6th Cir. 2015). But even in that respect, Plaintiff never produced evidence that Mr. Plowman took any other action with respect to Plaintiff that would infer he had knowledge Plaintiff was utilizing the inmate grievance system.

Nor has the Sixth Circuit allowed plaintiffs to establish inferred knowledge of a protected activity through an entity's "general corporate knowledge." *Evans*, 614 Fed. Appx. at 301. Thus, knowledge may not be inferred upon Mr. Plowman merely because ODRC and/or anyone else at SOCF had knowledge that Plaintiff was utilizing the inmate grievance system.

The Sixth Circuit has also rejected the argument that a defendant may inferred knowledge of protected activity merely because he regularly interacts with other individuals who would have direct knowledge of the protected conduct, holding that "[s]uch a general assertion is insufficient to support the specific inference that [the defendant] knew of the protected activity. *Id.* at 301. Thus, Plaintiff cannot infer that Mr. Plowman knew of his utilization of the inmate grievance system merely because he converses with other correction officers as Plaintiff implied at trial.

Even if this inference were permitted, there was no evidence demonstrating Mr. Plowman conversed with other correction officers or prison officials that had actual knowledge of Plaintiff's utilization of the inmate grievance system. *Id.* at 303 (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 553 (6th Cir. 2002).

Nor can Plaintiff impute this knowledge upon Mr. Plowman merely because he acknowledged at trial that inmates routinely utilize the inmate grievance system. This is again an improper general assertion of inferred knowledge with no specifics that the Sixth Circuit has rejected. *Id.* at 300 and 302 (quoting *Mulhall*, 287 at 552). ("Circumstantial evidence can support a reasonable inference of the [defendant's] knowledge if the evidence is comprised of 'specific facts' and not merely 'conspiratorial theories,' 'flights of fancy, speculations, hunches, intuitions, or rumors.'").

Because Plaintiff did not produce evidence at trial, when viewed in a light most favorable to him, of a causal connection demonstrating Mr. Plowman's motive to retaliate against him, Mr. Plowman is entitled to qualified immunity under the first prong of the Supreme Court's qualified immunity test. In short, Plaintiff did not demonstrate that Mr. Plowman engaged in a constitutional violation.

**D. The evidence admitted at trial, when viewed in a light most favorable to Plaintiff, does not establish an Eighth Amendment Excessive Use Of Force Claim against Mr. Coppick.**

**1. Subjective Component.**

Plaintiff testified that Mr. Coppick violated his Eighth Amendment right by slamming his head into the wall, causing him to suffer lacerations to his head. Plaintiff further testified that Mr. Coppick caused further injury to his head while he was on the ground a second time outside the entrance to the J2 housing block. Plaintiff's claims against Mr. Coppick does not satisfy both the

subjective and objective elements of the excessive use of force standard. Even when viewed in a light most favorable to Plaintiff, the admitted evidence demonstrates that Mr. Coppick used the least amount of force necessary in maintaining control of Plaintiff, who undoubtedly was acting aggressive and being non-compliant in his escort to the J2 strip cell.

Even if Mr. Coppick was manipulating Plaintiff's fingers during the escort as he testified, finger manipulation is a means to gain compliance when verbal commands do not work. Additionally, Plaintiff was non-compliant in other ways during the escort when they reached the gate to enter the J corridor by admittedly turning towards Mr. Coppick. At this time, Mr. Coppick unequivocally believed that he was losing control over Plaintiff during the mass movement of other inmates, creating a very dangerous situation for inmates and staff. Both Plaintiff and Mr. Coppick acknowledged struggling against each other, and Mr. Coppick testified that because Plaintiff refused to obey verbal commands, the digital manipulation was not working to gain compliance, to obtain control over Plaintiff, he attempted to place him on the ground. In doing so, he used reasonable force on the Plaintiff and his head coincidentally struck the wall.

If this was not enough, the video evidence shows Plaintiff remained non-compliant once he was being escorted and placed on the wall adjacent to the entrance to the J2 housing block. Plaintiff admitted turning towards Mr. Coppick, and the video surveillance undoubtedly shows Plaintiff's leg turning out while he is pushing back against Defendants Coppick and Plowman. This Court already found that Plaintiff was non-compliant and struggled with Defendants Coppick and Plowman when placed upon the wall adjacent to the entrance to the J2 housing block. [Doc. 72, PageID 1199]. It further found other correction officers did not use excessive use of force as they struggled with Plaintiff when he was on the floor.

A correction officer does not violate the Eighth Amendment when they use of force in "a good faith effort to maintain or restore discipline."

During the escort, Plaintiff acknowledged not facing forward, and he was attempting to subvert the escort by planting his feet and pushing his torso back towards Officer Coppick. Plaintiff was also clearly aggressive by struggling with both Officers Coppick and Plowman both inside the sally port and outside the entrance to the "J2 South Block." [Video Surveillance at 4:23:01 PM – 4:23:11 PM]. Officer Coppick testified as to the necessity of escorting Plaintiff to the segregation block at the earliest opportunity possible, stating there were other incarcerated individuals that were also being escorted to the same location. Further evidence showed other unrestrained individuals were present in the corridors where Plaintiff was being escorted. Officer Coppick testified that it was necessary to maintain control of Plaintiff not only for his safety, but also for the safety of Plaintiff and other incarcerated individuals.

None of Officers Coppick, Plowman, Smith, Boyd, and Kinner's actions were sufficiently serious to offend contemporary standards of decency. No reasonable individual can find that Mr. Coppick's actions were sadistic or malicious in any manner. Both Mr. Coppick and Plaintiff testified that they struggled at the gate that enters into the J corridor and along the wall adjacent to the entrance into the J2 housing block. This struggle was due to Plaintiff refusing to follow orders, resisting and acting in an aggressive manner. Mr. Coppick testified he believed he was losing control over Plaintiff, and he required regaining control over him due to the mass movement of other inmates. The evidence demonstrates Mr. Coppick reasonably believed the minimal amount of force he used was necessary to control Plaintiff and maintain discipline.

At a maximum, the evidence showed Mr. Coppick used only a negligent or reckless level of force to regain control over Plaintiff, which does not rise to a constitutional violation. *Johnson v. Sootsman*, 79 F.4th 608, 621 (6th Cir. 2023).

**2. Objective Component**

Furthermore, Plaintiff's injuries stemming from Mr. Coppick's conduct were *de minimis* at best. Despite the struggle between the correction officers and Plaintiff, caused by Plaintiff's blatant disregard of the verbal orders, Plaintiff incurred only three small cuts. While Plaintiff's cuts may have bled at the time of the incident, as is common with cuts to the forehead, Plaintiff acknowledged the bleeding had stopped prior to being escorted to the infirmary. Plaintiff further testified the cuts only required "butterfly strips" as treatment. Plaintiff acknowledged not complaining of any other injury to his person nor did he seek further medical treatment. Plaintiff was inherently unclear as to any injury to his brain or head from a neurological standpoint and further did not testify to any duration of such injury. Furthermore, it was entirely inappropriate to assign any injury to Plaintiff's leg, since it was Mr. Plowman, and not Mr. Coppick, manipulating his leg while on the ground in the J corridor and there is evidence and testimony that he may have injured his leg when he fell as he was initially walking toward the fight in direct disregard of orders.

When viewed in a light most favorable to Mr. Coppick, no reasonable person can conclude that Plaintiff suffered any injury other than a *de minimis* laceration injury to his forehead.

**3. Mr. Coppick is entitled to qualified immunity.**

Because Mr. Coppick also raises the affirmative defense of qualified immunity again, Plaintiff is required to produce to the Court (1) a Sixth Circuit or Supreme Court case that (2) existed prior to May 19, 2019, (3) with specific facts similar to those facts admitted at trial, that

would have placed Mr. Coppick (and the other defendants) on notice that their behavior was unlawful.

The Court has previously cited *Cordell v. Kinney*, 759 F.3d 573 (6th Cir. 2014) as being clearly established law applicable to this matter where Mr. Coppick should have known his conduct was in violation of the Constitution. However, *Cordell* is factually distinguishable from this matter to where it would not amount to clearly established law under the qualified immunity test under *Burnett*, *supra*.

As shown in the video surveillance, the inmate plaintiff in *Cordell* did not create "an immediate exigency by pulling away from [the defendant]." *Burnett*, 33 F.4th at 912. The same is true in this matter: unlike plaintiff Cordell, Plaintiff is seen resisting the escort by planting his feet. Plaintiff acknowledged the same in his testimony. Furthermore, when they approach the gate to enter the J corridor, not only does Plaintiff turn towards Mr. Coppick, but he also pulls from Mr. Coppick's grasp. Unlike Cordell, "[Plaintiff] was resisting control, which was never the situation with Cordell." *Id.* Both Mr. Coppick and Plaintiff testified that they struggled with each other, plainly representing a loss of control by Mr. Coppick over Plaintiff. In distinguishing *Cordell*, the Sixth Circuit expressly held "[t]he fact that Cordell was always under control was a key consideration in [its] ultimate holding that a reasonable jury could find that the prison officer in that case used excessive force." *Id.* (citing *Cordell*, 759 F.3d at 584-88).

Other facts in *Cordell* significantly contrast from this matter. Cordell and the officer defendant were in an area of the jail where only jail officials were present. *Id.* Here, Plaintiff and Mr. Coppick were in the presence of other high security risk inmates during a mass movement event after a fight. Mr. Coppick was not reprimanded for his conduct whereas the officer defendant in *Cordell* was reprimanded. *Id.* (citing *Cordell*, 759 at 584).

The injuries in *Cordell* are also greatly distinguishable from the injuries in this matter. The record in *Cordell* established that not only did he suffer a head laceration, but the laceration required five stitches to close the wound. *Cordell*, 759 F.3d at 583. Plaintiff, on the other hand, only required butterfly strips to close his lacerations, which had already stopped bleeding by the time he was escorted to the infirmary. The record in *Cordell* also established that he immediately complained of head and neck pain. Here, Plaintiff never reported head or neck pain to any medical personnel. Furthermore, *Cordell* had professional medical testimony to establish that the "use of force created 'a shift in the axis to the left of the odontoid process,' a shift that 'aggravated a preexisting but asymptomatic degenerative pathology' and led to 'chronic pain syndrome.'" *Id.* There is no such evidence within the record here to demonstrate an extensive injury as there was in *Cordell*.

This matter is more representative of the factual scenario in *Griffin v. Hardrick*, 604 F.3d 949, 955 (6th Cir. 2010), where the plaintiff was clearly struggling with the officer that was attempting to bring her under control when he performed a leg-sweep maneuver. In that matter, the Sixth Circuit found that the leg sweep was not conducted in a wanton manner because the correction officer was acting as trained when attempting to gain control of the plaintiff.

Because this matter is factually distinguishable from *Cordell*, there was not clearly established law that would have put Mr. Coppick on notice that his conduct amounted to a constitutional violation. As such, Mr. Coppick is entitled to qualified immunity.

**E. In the alternative, the Court should grant Defendants a new trial under Fed. R. Civ. P. 59.**

The Sixth Circuit has held that "[a] new trial is justified under Fed. R. Civ. P. 59 'when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving

party in some fashion, i.e., the proceedings being influenced by prejudice or bias.'" *Allsopp v. Foust*, No. 23-5203, 2024 U.S. App. LEXIS 13189, *13 (6th Cir. May 31, 2024) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citations omitted)).

Here, and as explained herein, the jury's verdict is against the weight of the evidence:

As to Mr. Bauer, it was uncontroverted that Mr. Bauer unmistakenly believed that Plaintiff was being aggressive and spat on him. The video also plainly demonstrated Plaintiff being non-compliant and aggressive, and Mr. Bauer testified about using the least amount of force available to him in order to bring order to a recalcitrant inmate. Finally, Plaintiff produced no evidence to support he suffered an actual injury beyond a *de minimis* injury of being temporarily discomforted due to his exposure to O.C. spray.

As to Mr. Plowman, there was no evidence he was motivated in any way by Plaintiff's utilization of the grievance system in issuing a conduct report against him. In fact, there was no evidence, whether direct or circumstantial, showing Mr. Plowman even had knowledge of Plaintiff's use of the grievance system.

As to Mr. Coppick, it was uncontroverted that he struggled with Plaintiff while they were waiting at the gate to enter the J corridor. The video also plainly demonstrated Plaintiff being non-compliant and aggressive during his escort, and Mr. Coppick testified about using the least amount of force available to him in order to obtain control over a recalcitrant inmate. Finally, Plaintiff produced no evidence to support he suffered an actual injury beyond a *de minimis* injury.

The Court should also grant a new trial on the basis that the damages awarded to Plaintiff are excessive. As to this averment, Defendants rely on the facts and argument submitted in the separate Rule 59(e) Motion to Alter or Amend Judgment being filed in concurrence with this motion.

Finally, should the Court grant any of the defendants judgment as a matter of law, the Court should grant any defendant who has judgment remaining against them a new trial. It is without doubt that the jury was influenced to award Plaintiff excessive damages based on a theory that all of the defendants acted in concert against Plaintiff to violate his constitutional rights. Without any piece of Plaintiff's larger puzzle, it is more likely than not that the jury would not have awarded such a high number in damages with respect to other defendants.

## IV. CONCLUSION

The Court should grant Defendants' motion for judgment as a matter of law. The evidence admitted at trial, even when viewed in a light most favorable to Plaintiff demonstrates that he did not satisfy the elements required for excessive use of force and retaliation claims. The Court should award judgment as a matter of law in favor of each defendant, including Plaintiff's excessive use of force claims against Defendants Bauer and Coppick and Plaintiff's retaliation claim against Defendant Plowman. Furthermore, as described herein, all of the Defendants are entitled to qualified immunity. Alternatively, the Court should grant each defendant a new trial under Rule 59.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ D. Chadd McKitrick*
**D. CHADD MCKITRICK (0073750)**
**SALVATORE MESSINA (0097510)**
Senior Assistant Attorney General
Criminal Justice Section
Corrections Litigation Unit
30 E. Broad Street, 23rd Floor
Columbus, Ohio 43215
(614) 644-7233/FX: (866) 359-3383
Daniel.McKitrick@OhioAGO.gov
Salvatore.Messina@OhioAGO.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, a copy of the foregoing *Defendants' Motion for Judgment as a Matter of Law* was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ D. Chadd McKitrick*
D. CHADD McKITRICK (0073750)
Senior Assistant Attorney General

*Counsel for Defendants*